James R. SEARER, Plaintiff,

v.

WEST MICHIGAN TELECASTERS, INC.,
a Michigan corporation, Defendant.

Civ. A. No. G 210 73 CA1.

United States District Court,
W. D. Michigan, S. D.

Aug. 22, 1974.

**636**

Carl S. Krueger, Krueger & Lesica, Muskegon Hts., Mich., for plaintiff.

Peter W. Steketee, Vander Veen, Freihofer & Cook, P. C., Grand Rapids, Mich., for defendant.

## MEMORANDUM OPINION

FEIKENS, District Judge, Sitting by Designation.

This is a section one, Sherman Act (15 U.S.C. § 1) suit. Plaintiff, a Michigan resident, was affiliated from 1968 through 1972 with Channel 41, Inc. in Battle Creek, Michigan, as its principal stockholder, director, executive vice president and president. Defendant, West Michigan Telecasters, Inc., a Michigan corporation, owns and operates television Channel 13 in Grand Rapids, Michigan.

Plaintiff's theory of recovery has undergone some rather substantial changes since the suit was first filed. The original complaint alleged that defendant had from 1965 through 1972 engaged in "numerous illegal actions in an effort to delay, impede, and block the efforts of plaintiff to establish and continue a viable television facility in Battle Creek, Michigan, which would be capable of successfully competing with defendant's station and others in the Western Michigan market". Among the specific actions cited were attempts to induce or coerce the persons associated with plaintiff to breach their contractual relations with him; the institution of a "spurious law suit against plaintiff and his associates"; various attempts to extend Channel 13's signal into Channel 41's broadcast area; disparagement of plaintiff's character and attempts to impair his credit; insertion of unauthorized programming on the network feed which Channel 41 received from Channel 13, causing blank spaces and other interferences with Channel 41's programming; attempts to block Channel 41's affiliation with the American Broadcasting Company; and "other tactics" designed to obstruct Channel 41's operation. The complaint then asserted that:

"the acts of Defendant set forth above were in violation of Plaintiff's rights and interests; that said acts of Defendants have seriously damaged

Plaintiff's reputation as a broadcaster; that the money value of Plaintiff's interest in the joint venture, partnership and corporations in connection with Channel 41 has been seriously impaired by the unfair trade practices and tactics of Defendants; and said wrongful acts of Defendants have impeded Plaintiff's opportunity to pursue his chosen profession without undue interference."

Recovery was sought under the unfair trade practices provisions of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).

Defendant's response was a motion to dismiss, contending that there is no private cause of action under that statute. *See, e.g.,* Holloway v. Bristol-Myers Corp., 158 U.S.App.D.C. 207, 485 F.2d 986 (1973); Carlson v. Coca-Cola Co., 483 F.2d 279 (9th Cir. 1973). Plaintiff then amended his complaint to assert a violation of sections one and two of the Sherman Act. However, he did not even attempt to state a claim of attempt or conspiracy to monopolize or of monopolization. All allegations, argument and proofs have been directed toward a conspiracy in restraint of trade, and plaintiff's counsel has conceded that he has no section two case. Transcript of Hearing, February 8, 1974, at 6. The conspiracy alleged under section one was itself highly suspect, plaintiff having identified the conspirators only as "agents of Defendant whose names are not presently known to Plaintiff and others not presently known to Plaintiff".

Following a renewal of defendant's motion to dismiss, the matter came before the court on oral argument. At that time plaintiff's attorney suggested that the "others" referred to in the amended complaint were in fact one Mary Jane Morris, a former associate of the plaintiff, and that the unlawful conspiratorial activity consisted of negotiations between Morris and West Michigan Telecasters to settle a prior lawsuit to which the plaintiff here had been a party. Plaintiff was given a further opportunity to amend his complaint so as to properly identify the conspirators and to describe the nature of the alleged conspiracy.

In his second amended complaint plaintiff once again substantially changed his theory of the case, contending that the American Broadcasting Company was defendant's co-conspirator, and that the conspiracy consisted of ABC's acquiescence in West Michigan's practice of clipping and fraudulent billing for network broadcasts. *See* Federal Communications Commission, Public Notice: "Clipping" of Radio and Television Network Programs, FCC 73–230 (March 2, 1973):

"Affiliation contracts between broadcast stations and networks typically provide that the station will be compensated for carrying specific network programs, commercials, and other material, including, but not limited to, network identifications, credit announcements or promotional material. In order to collect payment, the station periodically submits a statement to the network certifying that the specified network material has been broadcast. A certification form usually has space to indicate deletions or cancellations of network material. If deletions or cancellations are indicated by the station, the amount of payment received from the network may be reduced. 'Network clipping' means that the licensee has not fulfilled its contractual obligation to the network, by certifying that specified network material was broadcast in full when there were, in fact, cancellations or deletions."

Both Channel 13 and Channel 41 are ABC affiliates. Until recently, and during the period in question, Channel 41 did not receive its signal directly from ABC, but rather, pursuant to a contract with Channel 13, picked up its ABC signal from Channel 13's transmission. Plaintiff claims that Channel 13 was clipping network programs in order to carry its own commercials, thus creating unannounced variations in the programming received by Channel 41. Plaintiff

says that this disruption caused blank spaces in Channel 41's transmission and made him appear incompetent. This claimed appearance of incompetence was in turn alleged to be responsible for plaintiff's inability to sell advertising for the station, which constituted the alleged restraint of trade.

In support of its vigorously reasserted motion to dismiss, defendant submitted the affidavit of George Lyons, vice president and general manager of West Michigan Telecasters. One issue raised was whether plaintiff's own negligence in not adhering to the terms of his contract with Channel 13 was the real cause of the claimed injury. Pursuant to Rule 12(b), the court determined that matters outside the pleadings had been put in issue and that the motion to dismiss should be treated as one for summary judgment and disposed of as provided in Rule 56. Both parties were so notified, and were then given an opportunity to present all material made pertinent to such a motion by Rule 56. Plaintiff has submitted two affidavits; defendant has made no further submissions.

■■■ Although the affidavits and other materials relevant to this motion do not resolve all factual disputes, particularly as to whether the defendant engaged in clipping, that alone is not enough to resist summary judgment. The fact remaining at issue must be material. Proler Steel Corp. v. Luria Bros. & Co., 417 F.2d 272, 273–274 (9th Cir. 1969). A dispute as to immaterial facts does not bar summary judgment. Robbins v. Gould, 278 F.2d 116, 120 (5th Cir. 1960).

"The principal question that arises on a motion for summary judgment is whether factual issues of legal significance—'material facts'—remain to be resolved at trial. Rule 56(c), F.R. Civ.P., provides that summary judgment shall be granted where the record shows 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' It is not enough for the party opposing the motion for summary judgment merely to point to disputes of fact. As this court observed in McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902, 905 (9th Cir. 1968), 'The showing of a "genuine issue for trial" is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law.'" Bushie v. Stenocord Corp., 460 F.2d 116, 118–119 (9th Cir. 1972).

For purposes of this motion all genuine issues of fact are resolved in favor of the plaintiff and all inferences drawn from the facts thus presented are likewise those which are most favorable to the plaintiff. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); 6 J. Moore, Federal Practice ¶ 56.15[3] at 2337 (2d ed. 1974). Accepting plaintiff's version of the facts, the court holds that plaintiff has no cause of action under the Sherman Act.

Plaintiff's case is tenuous and awkwardly contrived. Some of its essential elements are open to serious question. But the most basic and ultimately fatal flaw is the absence of a direct and substantial causal link between the alleged conspiracy and the claimed restraint of trade. Unless the conspiracy is of a type which is considered a per se violation, section one of the Sherman Act applies only if an unreasonable restraint of trade was either the object or the effect of the conspiracy. See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Cities Service Oil Co. v. Coleman Oil Co., 470 F.2d 925, 930–931 (1st Cir. 1972). The type of agreement involved here does not fall within any of the per se categories, and there is no indication that the conspirators' specific intent as to the clipping was predatory or otherwise anticompetitive. Plaintiff

must therefore establish that the conspiracy resulted in a restraint of trade if he is to prevail. Here the facts and allegations of the complaint demonstrate conclusively that the conspiracy between West Michigan Telecasters and ABC, even if it could be proved, did not result in an actionable restraint of trade.

The court assumes for purposes of this decision that the conspiracy to clip existed as alleged and that plaintiff concurrently or subsequently encountered increased difficulty in selling advertising for Channel 41 because the advertisers thought him incompetent. It may also be assumed arguendo that the clipping of Channel 13 resulted in unscheduled variations from previously announced network programming, that these variations required Channel 41 to insert extra filler material in order to cover the added commercial time taken by Channel 13, and that the staff of Channel 41 may have been unable to fill all of these unexpected spots of free time smoothly and efficiently, thereby causing gaps or other interruptions of Channel 41's programming. The primary evidence bearing on the frequency or seriousness of these interruptions is contained in the logs of Channel 41 operations during the time period in question; this is set forth in plaintiff's affidavit. For the most part these merely indicate what was cut by Channel 13 and do not explain what Channel 41 did to fill the gaps; those which do have a notation concerning Channel 41's reaction indicate that network promotionals or public service announcements were substituted for the commercials added by Channel 13. Even more significant, the logs reveal that most problems encountered by Channel 41, considered from plaintiff's point of view, had nothing to do with Channel 13's clipping. For example, the log for January 12, 1972 reveals three operator errors (something not aired, spot started with wrong slide, something else rolled out of order), one equipment breakdown (film projector would not start after a break), and three other discrepancies between scheduled and actual timing of programs or breaks not related to Channel 13's clipping. There is in addition an entry stating that Channel 13 cut all the credits from "The Persuaders". There is no indication of how Channel 41 responded, though two other unexpected gaps that day were filled with public service announcements. The other logs, although they vary in detail, are substantially similar in the overall account they present of Channel 41's day-to-day operations. In sum, they demonstrate that for a period of several months in 1971 and 1972 Channel 13 occasionally deviated from and did not carry in full all network programming. Channel 41 was able to cover at least some of these unexpected breaks. It is clear that such difficulties were a minority of those encountered by Channel 41, and that the majority of errors and interruptions of Channel 41's signal stemmed from other causes.

Also attached to Searer's affidavit are letters of January 16 and February 15, 1972, directed to ABC's vice president for affiliate relations. These shed further light on the extent to which the clipping disrupted Channel 41's operations. The first reads in part:

"I was rather surprised ABC's monitoring of WZZM breaks showed them free of any discrepancies. As you know, we have been taking off-the-air pickup from WZZM since July 24, 1971. At first our switchers were continually befuddled because our log, which was built from your TWX information, left our people looking inexperienced and incompetent. The main reason for this was WZZM. Instead of their taking the prescribed 33 or 63 seconds, they would as a matter of routine, take 43 and 73 seconds. It's also common practice for them to cut credits and delay openings . . . At first our people sat on our station ID, while WZZM did their thing. We finally wised up and use this time for ABC promos; after all,

we feel this time belongs to the network, and this is the best way to cover."

The second asserts that

"we had no choice but to fill extra time that WZZM was using for commercials. I explained that we covered their extended breaks by throwing up ABC promos, and that it took us awhile to learn their pattern, and how it differed from the ABC TWX."

It is apparent that the relationship between the alleged clipping and Channel 41's inability to sell advertising is highly attenuated. Plaintiff's own materials demonstrate that breaks resulting from the clipping were only one of several problems, all of which might contribute to impressions of incompetence. Certainly it would be difficult if not impossible to separate the effects of the clipping-caused errors from that of other errors. Furthermore, plaintiff has admitted that despite the early disruptions caused by the clipping, Channel 41 soon learned to cover with promotional inserts. Even the earlier "gaps" were not total blanks in 41's transmission, but merely the showing of station identification for a few seconds. Because the restraint of trade alleged here supposedly resulted from the appearance that plaintiff and his staff were incompetent, only that clipping which was not covered could have contributed to that impression. Plaintiff is clutching at straws.

Finally, plaintiff has not disputed the authenticity of a copy of the contract between Channels 13 and 41 which was attached to the affidavit of defendant's vice president and general manager, and which provides in part (with emphasis added):

"WZZM–TV [Channel 13] agrees to mail three weeks in advance of air date its station program schedule. Channel 41 will receive all of its normal ABC program information from ABC by way of their network TWX.

"WZZM–TV will also supply Channel 41 with all last minute program changes to be accomplished through a daily phone call *from Channel 41 to WZZM–TV's Traffic Department*. This service must be kept to a 4 P.M. deadline the working day prior to telecast of any ABC network programming."

The accompanying affidavit asserts that all deviations from the ABC signal, such as those complained of by plaintiff, have always been subject to easy ascertainment by Channel 41 from Channel 13's traffic department, as provided in the contract, and this has not been denied by plaintiff.

It seems, therefore, that whatever disruptions were caused by the alleged clipping were interspersed with other errors or interruptions not attributable to the conspiracy; the time span of the disruptions was fairly short; and most if not all which did occur could have been prevented had plaintiff utilized the notification procedure provided for in the contract with Channel 13. Causation in fact between the conspiracy and the restraint is remote. Proximate causation is nonexistent.

■ There are at least three reasons why the defendant's motion for summary judgment must be granted, based on these conclusions. First and most obviously, conspirators who have not committed a per se offense and whose specific intent was not anticompetitive cannot be held to answer for a restraint of trade unless they played a not immaterial part in bringing it about. This requirement is inherent in the nature of the offense itself. The statute is simply not intended to reach agreements "that might in some insignificant degree or attenuated sense restrain trade or competition". United States v. Topco Associates, Inc., 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

■ Second, jurisdiction under the Sherman Act exists only as to agreements which "directly and substantially" affect interstate commerce; the connection cannot be merely "incidental", "in-

consequential", "remote" or "de minimis". *See e. g.*, United States v. Patten, 226 U.S. 525, 542, 33 S.Ct. 141, 57 L.Ed. 333 (1913); Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 526 (9th Cir. 1973), cert. denied, 412 U.S. 950, 93 S. Ct. 3014, 37 L.Ed.2d 1003; Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co., 469 F.2d 416, 418 (5th Cir. 1972); Spears Free Clinic and Hospital v. Cleere, 197 F.2d 125, 126–128 (10th Cir. 1952); Marston v. Ann Arbor Property Managers Ass'n, 302 F.Supp. 1276, 1279–1280 (E.D.Mich.1969), aff'd, 422 F.2d 836 (6th Cir. 1970), cert. denied, 399 U.S. 929, 90 S.Ct. 2244, 26 L. Ed.2d 796 (1970); Roofire Alarm Co. v. Royal Indemnity Co., 202 F.Supp. 166, 169 (E.D.Tenn.1962), aff'd, 313 F.2d 635 (6th Cir. 1963); Hotel Phillips, Inc. v. Journeymen Barbers Int'l Union, 195 F.Supp. 664, 667 (W.D.Mo.1961). The need for a direct and substantial impact upon commerce is not obviated by the absence here of dispute over the intra or interstate character of the commerce restrained.

█ Finally, even if the relationship between the conspiracy and the restraint constituted a Sherman Act violation, plaintiff's damages are too remote and speculative to permit a private suit based thereon. Private antitrust actions are authorized by section four of the Clayton Act, 15 U.S.C. § 15, which provides that:

> "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . .."

The plaintiff here has not sustained such an injury.

> "The statutory requirement that treble damage suits be based on injuries which occur 'by reason of' antitrust violations expressly restricts the right to sue under this section. There must be a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a 'material

cause' of or a 'substantial factor' in the occurrence of damage. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Note, Standing to Sue for Treble Damages Under Section 4 of the Clayton Act, 64 Colum.L.Rev. 570, 575–76 (1964)." Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

> "The pivot of decision presently is whether the defendants' asserted conduct was the proximate cause of the plaintiffs' asserted injury. If the damage was merely incidental or consequential, or if the defendants' antitrust acts are so removed from the injury as to be only remotely causative, the plaintiffs have not been injured 'by reason of anything forbidden in the antitrust laws' as contemplated by the Clayton Act." South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414, 419 (4th Cir. 1966).

> "It has long been the law that damages which are purely speculative, remote, or based upon conjecture cannot serve as a base for antitrust recovery, Siegfried v. Kansas City Star Company, 298 F.2d 1 (8 Cir. 1962). Although the mere difficulty of exact proof will not deprive a party of relief, still damages to be awarded must be susceptible of expression in figures founded upon some reasonable basis of computation. National Wrestling Alliance v. Myers, 325 F.2d 768 (8 Cir. 1963)." American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977, 996 (8th Cir. 1966).

The conspiracy's indirect and uncertain causal relation to the injury, if it does not negate a violation of the Act, certainly precludes plaintiff from suing therefor.

**642**

■ What is painfully obvious from the history of this case is that the plaintiff is straining to fit within antitrust mold grievances which are of a quite different sort. His litany of the defendant's wrongs includes conduct which might be characterized as unfair, unethical, violative of FCC regulations, fraudulent, and tortious. However, he makes the all too common mistake of supposing that such conduct, when undertaken in a business setting, automatically qualifies as a violation of the antitrust laws. *Cf.* Ace Beer Distributors v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963); Overseas Motors, Inc. v. Import Motors Limited, Inc., 375 F.Supp. 499 (E.D.Mich.1974); B & B Oil & Chemical Co. v. Franklin Oil Corp., 293 F.Supp. 1313 (E.D.Mich. 1968). It is nowhere more evident than in the plaintiff's supplemental affidavit that the gravamen of his case lies outside the scope of section one.

That affidavit was submitted after the case had been taken under advisement, pursuant to the court's request under Rule 56(e) for "a further showing . . . of the specific facts by which you intend to prove that the alleged conspiracy was the proximate cause of an unreasonable restraint of trade". Letter from the court to Carl S. Krueger, attorney for the plaintiff, dated June 18, 1974. That letter had been prompted by dissatisfaction with the state of the record and a concern that plaintiff might not have satisfactorily addressed the causation issue simply because he was not aware of it. The court intended to give plaintiff every opportunity to show that he could at least make a prima facie case.

■ His late-filed responsive affidavit had very little to say about the events alleged in his second amended complaint, and even less to say about causation. Instead, plaintiff attempted to reinsert into his case all of the unfair trade practices which had been listed in the first complaint. He detailed at great length how the defendant had opposed and hindered his efforts to obtain the license for and operate Channel 41.

He referred to licensing proceedings before the FCC, attempts to extend Channel 13's signal into Channel 41's broadcast area, the institution of a suit in state court and its subsequent settlement by his then associates, and their later desertion, especially that of Mary Jane Morris, to West Michigan Telecasters. Despite an assertion at one point that these events were part of a single conspiracy also involving the clipping, there is absolutely no basis in fact or logic for such a connection, and whatever animus these events may reveal cannot be carried over into the clipping theory. They are not part of nor do they support the antitrust claims which he has pleaded. They probably do not state an antitrust cause of action in their own right—*see* California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S. Ct. 609, 30 L.Ed.2d 642 (1972)—and even if they did, the statute of limitations has certainly run as to the acts involved—*see* 15 U.S.C. § 15b; Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)—and probably as to any injuries sustained as a result of those acts. *Id.* What they do accomplish is to alert all concerned that those events, although not themselves actionable in antitrust, are the real motive for this suit. Plaintiff himself readily admits as much in paragraph 16 of the affidavit: "I believe the course of action that caused embarrasment [sic] and loss of income to me, as general manager and stock holder [sic] of Channel 41 is well established in the previous paragraphs of this affidavit." As for the issue of the causal relationship between the conspiracy and the injury, plaintiff says only that he believes

"that most of the specific facts by which I intend to prove that the alleged conspiracy was the proximate cause of any unreasonable restraint trade [sic] can be found in the files and correspondence between West Michigan Telecasters, . Inc. and the American Broadcasting Company and Mary Jane Morris. I further believe

that detailed depositions of the people involved, detailed examinations of the records of Defendant, West Michigan Telecasters, Inc., and detailed examinations of the files of the American Broadcasting Company will reveal in detail many of the facts that I am merely alleging in this amendment and supplimental [sic] affidavit." Plaintiff's Supplemental Affidavit, ¶ 15.

Such further discovery, although permitted in appropriate cases under Rule 56(f), is unwarranted in this case, where it is clear that it would not be directed at filling a specific evidentiary gap, but rather would consist of blind groping, undertaken in the hope of finding something to which this suit could be anchored.

■■■ It is true that summary procedures should be used sparingly in complex antitrust litigation. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). However, this policy of restraint is no warrant for every plaintiff who can draft an antitrust complaint, no matter how groundless or improbable its allegations, to force his claim to trial despite its deficient factual underpinning. The Rule is quite clear and applies to all cases, even antitrust cases.

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e).

"To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

Statements made "on information and belief", which comprise nearly all of the crucial points made by plaintiff in his affidavits opposing the motion, are not competent to meet the burden imposed on the respondent by Rule 56(e).

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

No matter what else the defendant here may have done, it has not, under any set of facts which plaintiff could adduce in support of his claim, violated section one of the Sherman Act. "There is", as defendant contends, "no logical or factual connection between any such conspiracy, even if it did exist, and any restraint of trade in violation of Section 1 of the Sherman Act", and "it is only by a wild leap of faith that one can trace any of this to any injury to Channel 41, much less to Plaintiff". Defendant's Reply Brief of February 22, 1974, at 6.

Summary judgment is therefore granted in favor of the defendant, dismissing the action. An appropriate order may be submitted.