**TREND EXPORT FUNDING CORPORATION, Plaintiffs,**

v.

**FOREIGN CREDIT INSURANCE ASSOCIATION, Defendant,**

**Continental Bank International and Banco Totta & Acores, Involuntary Plaintiffs.**

No. 84 Civ. 4839 (LBS).

United States District Court, S.D. New York.

Jan. 2, 1987.

Kraver & Parker, New York City, for plaintiffs; Richard M. Kraver, Lewis S. Fischbein, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant; Henry A. Hubschman, Matthew Gluck, of counsel.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, for involuntary plaintiffs, Banco Totta & Acores; Gregor F. Gregorich, of counsel.

SAND, District Judge.

Plaintiff, Trend Export Funding Corporation ("TEFCO"), an international business broker, alleges that defendant, Foreign Credit Insurance Association ("FCIA"), an insurer of such transactions, wrongfully failed to pay on two claims properly submitted by plaintiff totalling $7,060,597.61 plus interest. Defendant has moved pursuant to Rule 56, F.R.Civ.P., for summary judgment and for an order staying discovery. Defendant has also moved for leave to file an amended counterclaim. Plaintiff has cross-moved for summary judgment.[1]

The underlying facts giving rise to this lawsuit are as follows: TEFCO is in the business of arranging financing for the purchase of vehicles and equipment by foreign entities from United States manufacturers. Affidavit of Philip T. Amico, former Vice President of TEFCO ("Amico Aff.") at ¶ 4. From November 1981 until April 1982, TEFCO provided the financing for certain vehicles sold by General Motors Overseas Distribution Corp. ("GMODC") and certain tractors sold by H.O. Penn Machinery Co., Inc. ("Penn") to Saleh Ben Abd-El Wahab Company ("El Wahab"), of Riyadh, Saudi Arabia. To secure these two business deals against commercial risks, TEFCO obtained separate insurance policies from FCIA. *Id.* at ¶ 6. FCIA is an unincorporated association of insurance companies which, pursuant to 12 U.S.C. § 635(c)(2), acts as an agent for the Export-Import Bank of the United States ("Eximbank") in making available export credit insurance to United States exporters. Affidavit of Mary Coffey, claims supervisor at FCIA ("Coffey Aff.") at ¶ 2. FCIA issued a medium term-single sale insurance policy (the "single-sale policy") to cover the single sale of the Penn equipment, and a medium term-multiple sale comprehensive export credit insurance policy (the "repetitive-sale policy") to cover the multiple GMODC shipments. Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 7. With respect to each specific transaction arranged by TEFCO, FCIA issued separate "transaction endorsements" identifying the given transaction and containing special conditions of coverage. Coffey Aff. at ¶ 5.

1. Banco Totta & Acores ("BTA"), formerly an additional defendant in FCIA's counterclaim and now an involuntary plaintiff, is a creditor of TEFCO and an assignee of the proceeds of the policies in question. BTA has filed few papers regarding the instant motion and stated at oral argument that it is TEFCO that has vigorously prosecuted this action. To the extent that BTA's position differs from that of TEFCO, it will be noted herein. Continental Bank International, as agent for Involuntary Plaintiff Federal Deposit Insurance Corp., has not appeared with respect to the instant motions.

The GMODC vehicles and the Penn tractors were shipped to El Wahab, which later defaulted on making the bulk of its payments. In June of 1983, TEFCO filed with FCIA under each of the two policies a separate "notice of claim and proof of loss." After an exchange of letters between the parties, FCIA took the position that it would not pay TEFCO under either policy, prompting TEFCO to bring this action.

## MOTIONS FOR SUMMARY JUDGMENT

In its motion for summary judgment, FCIA avers that it has no liability to TEFCO for the claims in dispute because TEFCO failed to meet those conditions in each insurance policy that triggers FCIA's duty to compensate TEFCO. Specifically, FCIA asserts that both claims were properly denied because TEFCO had allowed the goods to be shipped to El Wahab before El Wahab had made certain required cash down payments. Alternatively, FCIA contends that TEFCO's claims are time-barred by express time limits stated in the policies. Further, FCIA urges that with respect to the repetitive-sale policy that covered the GMODC vehicles, FCIA need not pay TEFCO on certain of those claims because TEFCO had failed to pay FCIA the required insurance premiums or because, contrary to the terms of the policy, the goods shipped to El Wahab were not of American origin. TEFCO cross-moves for summary judgment, asserting that it has met all the conditions precedent to payment by FICA under the policies in question and that the policies are in full force and effect.

For the reasons explained herein, we grant that part of defendant's motion for summary judgment that relates to plaintiff's claims regarding the GMODC vehicles noted above. We deny defendant's motions for summary judgment on the remainder of plaintiff's claims, granting leave for defendant to renew the motion after more discovery is taken. And, finally, we deny plaintiff's cross-motion for summary judgment.

We address first that portion of defendant's summary judgment motion that relates to plaintiff's entire cause of action.

## I. PLAINTIFF'S PURPORTED FAILURE TO OBTAIN CASH DOWN PAYMENTS

[1] Article III of both the single-sale and repetitive-sale policies provides:

III. *Definitions*

As used in this policy

A. *"insured transaction"* means a sale or sales approved by the Insurers on the conditions specified in the Transaction Endorsement; provided the products sold are:

·    ·    ·    ·    ·

3. sold for United States dollars on terms which require:

a. that the buyer make a cash payment on or before delivery of the products to the buyer at least equal to such amount as may be specified in such Transaction Endorsement; ...

Defendant contends that this language makes clear that the buyer must make a cash down payment at least equal to an amount called for in the transaction endorsement—in this case, 15 percent for each transaction—before a given commercial transaction rises to the level of an "insured transaction" under the policy. Defendant further contends that plaintiff never in fact obtained those payments from El Wahab.

Plaintiff counters by focusing on the phrase "terms which require" in Section III A.3 *supra* and urges that this language means that the buyer El Wahab need not actually *make* a cash down payment, but merely *agree* to make the payment, which plaintiff alleges El Wahab did indeed do. Moreover, plaintiff contends, the alleged requirement that TEFCO obtain a down payment is not a material term of the policy and therefore its breach cannot be used to excuse FCIA's performance. Alternatively, plaintiff argues, if the policy is indeed interpreted to require that the actual down payment be made, then more discovery is needed to determine whether the

appropriate payments have in fact been made. Finally, plaintiff contends that defendant has either waived its right to raise or should be estopped from raising the "cash down payment" condition of the insurance policy because after defendant had learned of El Wahab's potential default, defendant had stated it would entertain a rescheduling of El Wahab's debts if TEFCO provided detailed reasons why such a rescheduling was necessary.

For the reasons that follow, we find that the policy required that a 15 percent down payment actually be made, that this requirement was a material condition of the policy and that FCIA neither waived its right to assert that defense nor is it estopped from asserting it. Finally, we find that TEFCO is entitled to certain limited discovery to determine whether El Wahab did indeed make the required payments.

We find, as defendant contends, that the above-quoted Section III, which appears in both policies, clearly and unambiguously calls for a cash down payment to in fact be made. We note that while an ambiguity in a contract raises a factual question about the intention of the parties that is not usually amenable to summary judgment, "[t]he preliminary question of whether an ambiguity exists is a question of law that may be resolved summarily by the court." 10 A *Wright & Miller*, Federal Practice & Procedure § 2730.1 at 275–79 (1983). Even if the language of Section III, standing alone, could be read as TEFCO urges to call for a mere *agreement* that a down payment be made, when read in light of other undisputed facts, it is clear that Section III calls for the down payment to *actually be made* before any liability is assumed by FCIA.

That the parties intended this result can be inferred from an examination of the entire contract, *see Murray Oil Prods. v. Royal Exchange Assurance Co.*, 21 N.Y.2d 440, 288 N.Y.S.2d 618, 235 N.E.2d 762 (1968), as well as from extrinsic evidence evincing the meaning and intent of disputed terms, *see Eagle-Picher Industries v. Liberty Mutual Co.*, 682 F.2d 12, 17 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103

S.Ct. 1279, 75 L.Ed.2d 500 (1983). The transaction endorsements have been incorporated by reference into the policies by Article III A.3, which requires that the goods in question be sold "on the conditions specified in the Transaction Endorsement." The transaction endorsement for the sale of the Penn tractors states on page one that a cash payment of $435,000 (15%) was due on the contract price of $2,900,000, leaving a "financed portion" of $2,465,000. *See* Exhibit 2 to the Coffey Aff. Similarly, the transaction endorsement for the sale of the GMODC vehicles calls for a "Percentage of Cash Payment for each transaction: 15% (5% required at contract signing)." See Exhibit 3 to Coffey Aff. In addition, an FCIA brochure that was sent to TEFCO's broker, Foreign Credit Brokerage, Inc., states that "[u]nder the terms of the [medium-term] policy, the foreign buyer must make a 15 percent cash payment on or before delivery." Exhibit 27 attached to the Second Affidavit of Mary Coffey ("Second Coffey Aff.") at ¶ 7. Moreover, prior to filing suit, TEFCO's position throughout its protracted correspondence with FCIA revealed an understanding on TEFCO's part that the insurance contract in question required that a down payment in fact be made if the transactions were to be insured. *See* Letters of Philip T. Amico, Vice President of TEFCO, to Mary Coffey, dated September 9, September 29 and October 25, 1983, attached as Exhibits 11 and 13 to the Coffey Aff.; Telex of Philip T. Amico to Joseph M. Piepul, dated November 10, 1983, attached as Exhibit 19 to Coffey Aff. TEFCO does not dispute that such was its understanding, but argues instead that the company's own "mistaken interpretation of the policy language is ... irrelevant." Plaintiff's Reply Memorandum at 8–9 n. * This argument, however, is simply wrong. TEFCO's own interpretation of the contract language is most relevant. "Few things can better evidence the meaning of a contract than the actions of the parties themselves." *Ottley v. Palm Tree Nursing Home*, 493 F.Supp. 910, 914 (S.D.N.Y. 1980), *appeal withdrawn with prejudice*, 657 F.2d 264 (2d Cir.1981). *See also Kama*

*Rippa Music v. Scherkeryk,* 510 F.2d 837, 842 (2d Cir.1975).

TEFCO next argues that even if the insurance policy is read to require an actual down payment, El Wahab's failure to make that down payment will not relieve FCIA of its obligation to compensate TEFCO. TEFCO claims that under New York insurance law, the down payment requirement is a "warranty" by TEFCO, the breach of which is "immaterial" because it does not increase the risk of loss covered by the insurance contract; an immaterial breach of warranty, TEFCO argues, will not void an insurance policy under New York law. Alternatively, TEFCO contends that even if the breach is deemed to be material, FCIA should be estopped from raising the defense that the down payment was not made because FCIA "waived" that defense by entering into discussions with TEFCO about the possibility of restructuring El Wahab's debt to TEFCO after FCIA came to believe that the down payment requirement had not been met.

FCIA disputes the above and urges that at any rate the contract should be governed by federal common law rather than New York law because FCIA is an agent of the congressionally created Export-Import Bank, which is an agency of the United States. Under federal common law, TEFCO's defense that the down payment requirement was not a material warranty would be unavailable and its waiver and estoppel arguments would require a much greater showing by TEFCO.

It is not necessary to decide whether federal common law should apply,[2] however, because even under New York law, which is more favorable to the plaintiff, TEFCO's claims regarding materiality, waiver and estoppel are without merit.

■ Assuming *arguendo,* as plaintiff urges, that the "15 percent down payment"

requirement is a "warranty" under New York Insurance Law,[3] then plaintiff's failure to obtain that down payment will excuse FCIA from paying on the insurance policy only if such failure by plaintiff materially increased the risk of the loss against which defendant was insuring. N.Y. Ins.Law § 3106(b) (McKinney 1985) (formerly N.Y.Ins.Law § 150). It is certain, however, that such a failure would indeed increase the risk of the commercial loss at issue here. An actual down payment by the buyer lessens the insurer's risk in at least two respects: a) it provides some indication of the borrower's financial capability, and b) it increases the borrower's stake in the transaction and incentive not to default and forfeit the down payment. None of these risk reduction factors is satisfied by a mere agreement to pay as distinguished from actual payment. An agreement to make a down payment is merely another unsecured promise of the borrower.

■ Regarding waiver, TEFCO has failed to show any action on the part of FCIA indicating that FCIA intended to relinquish its right to require the 15 percent down payment. While FCIA did state to TEFCO that FCIA would entertain a rescheduling of El Wahab's debt under certain conditions, FCIA also made clear that any action on its part was "without prejudice to FCIA's right to deny the claims or any portion thereunder because of policy non-compliance." *See* Exhibit 26 to the Second Coffey Aff. Moreover, Article XI.I of each policy in question here says that failure on TEFCO's part to comply with any term cannot be excused, except by writing. There has been no evidence of such a writing; nor has there been any evidence that this non-waiver clause has itself been waived. Regarding estoppel, TEFCO has failed to put forth any colorable argument.

---

**2.** We note in passing that the Third Circuit Court of Appeals recently held that *state* law and standards should apply to claims on FCIA insurance policies, at least in determining whether an estoppel should lie. *Lovell Manufacturing Co. v. Export-Import Bank of the United States,* 777 F.2d 894 (3d Cir.1985).

**3.** Defendant contends that the "down payment requirement" is not a warranty, but merely a condition that must be met before a given commercial transaction rises to the level of an "insured transaction." We need not reach this question. *But cf. infra* p. 490.

Having found that the insurance policies in question called for an actual 15 percent down payment to be made before the goods were delivered, we turn to the crucial question of whether El Wahab indeed made such payments. While this turns out to be no simple inquiry, one thing is clear: TEFCO itself never received the full 15 percent down payment from El Wahab. TEFCO explains this circumstance by noting that since it was acting as a "confirming house" rather than as an exporter it "would not be receiving the entire fifteen [percent] ... down payment." Plaintiff's Reply Memorandum at 9. Obviously, in most circumstances a down payment is made to the seller. But plaintiff argues that in the context of this transaction the down payment requirement is satisfied if a payment has in fact been made to some appropriate party which can fairly be said in the light of economic realities to be a "down payment." We agree that the fact that TEFCO itself was not to receive the 15 percent down payment should not, standing alone, bar TEFCO from recovering from FCIA; the insurance policies do not specify to whom the payments must be made. Rather, this circumstance shifts the focus of the inquiry to whether, after more discovery, TEFCO could possibly make a showing that there is a genuine dispute about whether there were payments made by El Wahab that reduced the contract price against which the 15 percent down payment was to be applied.

Some further observations are appropriate. First, the "contract prices" are the prices stated on the transaction endorsements—$2,900,000 for the Penn tractors and $5,200,000 [4] for the GMODC automobiles. For each transaction these figures represent a gross price that El Wahab was to pay, with a percentage of this price going to TEFCO and a percentage going to the manufacturers, Penn and GMODC. There is much discussion by TEFCO of payments by El Wahab to others, such as local dealers and Zakariya, a purchasing consultant who is an expert in the specifications needed for equipment that is to operate in the harsh climate of the Middle East. It is not entirely clear whether these payments made up part of the gross contract prices that are quoted above or whether they were separate obligations by El Wahab. Only if the former is the case are these payments relevant. Otherwise, they do nothing to reduce El Wahab's obligation on the contract price or increase its stake in the transaction, purposes which, as noted above, are served by a down payment.

Second, the payments must have been made by El Wahab itself or by funds subject to its direction and control so that El Wahab's stake in the transaction will be enhanced. Obviously if TEFCO were to advance the funds for the down payment the purpose of a down payment would not be satisfied and there would be in essence an unsecured promise to pay. Plaintiff has averred that it received actual cash payments from El Wahab of $275,981 equalling more than 3.4 percent of each of the two contract prices. *See* Exhibit N–3 attached to Amico Aff.

TEFCO, pursuant to F.R.Civ.P. 56(f), contends that it requires additional discovery to determine whether the remaining 11.6 percent (approximately $945,000) of the 15 percent down payment was made, as it believes it was, to "the vendors, the local dealers and to others." Plaintiff's letter of June 6, 1985 (responding to defendant's letter of May 21, 1985) at 4. Some of these proposed items of discovery are clearly inappropriate. Request No. 7, discovery of FCIA for information FCIA has in its possession of payments made by El Wahab, is denied. FCIA has already sworn that it has no information and at any rate this information could come more appropriately from other sources. Request No. 6 is denied as it deals with the 3.4%

---

**4.** Although plaintiff, in Exhibit N–3 to the Amico Aff., refers to a "contract price" for the GMODC vehicles of $5,332,500 which brings the total contract price for both sales to $8,232,500, *see* plaintiff's letter of May 7, 1985, it is not clear how this figure is derived. At any rate, in a later correspondence, plaintiff accepts the fact that the contract price for the GMODC vehicles is $5,200,000 bringing the total contract price to $8,100,000. *See* plaintiff's letter of June 6 1985 (responding to defendant's letter of May 21, 1985) at 3.

allegedly paid by El Wahab to TEFCO and this has already been sufficiently demonstrated for the purposes of summary judgment. It is the remaining 11.6 percent of the 15 percent that is really at issue here. That part of Request No. 5 that seeks discovery of El Wahab to confirm that it provided TEFCO with deeds to its property valued at $10,000,000 to serve as security, is denied. TEFCO claims that to the extent that this property's value exceeds $6,900,-000, or 85 percent of the total contract price, the property is the equivalent of the required cash down payment. We disagree. It is difficult to perceive of such security constituting a "down payment." The insurer has the right to determine what conditions must be satisfied as a prerequisite to its liability and here has required a cash down payment, not some other form of collateral. Moreover, plaintiff alleges that the deeds to the property were transferred "early in the Spring of 1983," Amico Aff. at ¶ 32. This is after the equipment was delivered to El Wahab in the period between December 1981 and April 1982. Thus, even if the deeds could be conceived of as cash payments, they could not have been made, as required by the policies, "on or before the delivery of the equipment." Request No. 3, discovery of Ahmed Al-Khayat, Commercial Assistant to the United States Embassy Liaison Office in Riyadh to confirm that he saw evidence of payments made by El Wahab, is denied. Al-Khayat has already sworn that he has no personal knowledge of whether these cash payments were made. *See* Exhibit R attached to Amico Aff.

■ The remaining requests are arguably relevant: Request Nos. 1 and 2, to discover of Penn and GMODC whether El Wahab actually made any payments before the goods were delivered; Request No. 4, discovery of Zakariya to confirm payments made to him;[5] and that part of Request No. 5 that seeks discovery of El Wahab regarding amounts he may have paid. For the reasons that follow, we will allow plaintiff to conduct this limited discovery.[6]

F.R.Civ.P. 56(f) allows this Court to refuse an application for summary judgment or order a continuance while further discovery is conducted. We observe that TEFCO took remarkably little interest in insuring that El Wahab made the proper payments before receiving the goods. Indeed, plaintiff does not even seem to know to whom those payments were supposed to be made. While this leaves TEFCO in a position where it can do little more than hope that El Wahab did as it was supposed to do, TEFCO's conduct was not as egregious as the conduct of the parties in those cases in which the courts have refused to allow discovery. *See, e.g., Waldron v. Cities Service Co.*, 361 F.2d 671 (2d Cir. 1966), *aff'd sub nom. First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569, *rehearing denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Searer v. West Michigan Telecarters*, 381 F.Supp. 634, 643 (D.Mich.1974), *aff'd without opinion*, 524 F.2d 1406 (6th Cir.1975). While on the present record it seems unlikely that TEFCO's search will prove fruitful,[7] we cannot say that the chances of significant discovery are so remote that TEFCO should be denied the opportunity. We note that Rule 56(f) is to be applied liberally by the

---

**5.** This of course would be relevant only if TEFCO could make some showing that Zakariya's commission was included in the initial contract price.

**6.** Involuntary plaintiff BTA has submitted a proposed discovery schedule that is substantially similar to that submitted by TEFCO except that BTA proposes also to depose "an employee of TEFCO having knowledge of TEFCO's dealings with FCIA." BTA made this additional request, because "without the benefit of discovery, [it] has been forced to rely on the ability of TEFCO's counsel to sift through the apparently disorganized records of TEFCO. Banco Totta has

approximately $7 million at stake in this action." Letter of BTA to the Court, dated May 7, 1985. Proceeding with this deposition would not interfere with the prosecution of this action and the request is granted.

**7.** *See* Affidavit of Michael J. Scivoletti, Manager of Credit Analysis, Export Financing, Collections and Accounts Receivable for GMODC, indicating that all that GMODC received was the 85 percent (100 percent minus 15 percent down payment) of the $5.2 million contract price that TEFCO furnished.

courts. *Sample v. Gotham Football Club,* 59 F.R.D. 160 (S.D.N.Y.1973); *Berne St. Enterprises v. American Export Isbrandtsen,* 289 F.Supp. 195 (S.D.N.Y.1968); *Waldron v. British Petroleum Co.,* 231 F.Supp. 72, 94 (S.D.N.Y.1964).

We will allow TEFCO to conduct the limited discovery outlined above. TEFCO had originally requested 90 to 120 days for these purposes but later asked for an extension of an unspecified amount of time due to difficulties that are attendant to taking discovery in Saudi Arabia. We will grant TEFCO 150 days from the date hereof to conduct the discovery. After that time, defendant may renew its motions for summary judgment.

Plaintiff, having acknowledged that it had not received the entire 15 percent down payment but that it is relying on other facts and circumstances that it alleges satisfies this requirement, has the burden of producing evidence to satisfy this contention. In the event that the discovery which we permit herein cannot be conducted because of the unavailability of parties or rules of a foreign sovereignty, plaintiff will nevertheless have failed to sustain this burden.

## II. FCIA'S CLAIM THAT THE SUIT IS TIME–BARRED

■ FCIA also moves for summary judgment on the ground that TEFCO's action is time-barred by the express language of the insurance policies in question. Both the single-sale and the repetitive-sale policies contain the following language as standard provision Article IX:

### ACTION AGAINST INSURERS

No action shall lie against the Insurers or any of them with respect to any *loss* unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy;—nor until 90 days after the required proofs of *loss* have been filed with the Insurers, *nor at all unless commenced prior to the expiration of eighteen months from the date of default.* (Emphasis added).

While plaintiff and defendant each urge different interpretations of this clause, we find it unnecessary to resolve their differences at this time. This is because there is a genuine issue as to whether the 18–month limitation in the policy, indisputably extended to 21 months and 45 days, was further extended so that all of TEFCO's claims were timely. TEFCO claims that FCIA orally granted a 45–day extension in which TEFCO could file a claim. *See* Amico Aff. at ¶¶ 105–07. FCIA apparently disputes this claim. *See* Coffey Aff. at ¶ 23. TEFCO also claims FCIA granted an additional 30–day extension, for which there is documentary support, that FCIA has not recognized in its papers. *See* Amico Aff. at ¶ 103 and Plaintiff's Reply Memorandum at 41.

## III. FCIA's CLAIM FOR SUMMARY JUDGMENT ON CERTAIN SHIPMENTS UNDER THE GMODC POLICY

■ FCIA claims that shipments of certain GMODC vehicles made in April 1982 and covered by Invoices 38601 to 38605 were not "insured transactions" because TEFCO had failed to make the required premium payments or, alternatively, because the goods it shipped were not of United States origin. TEFCO's claims under these specific shipments are for $1,117,-216.50. We find that summary judgment is appropriate here because the goods covered by Invoices 38601 to 38605 are not of United States origin as that term was used in the context of those transactions. Thus, we need not consider arguments relating to premium payments.[8]

---

**8.** Although it is unnecessary to rule on FCIA's "premium payment" argument, we make these observations. Article VI of the standard terms and conditions of the repetitive-sale policy that covered the GMODC sales, provides in pertinent part:

VI. AGREEMENTS OF THE INSURED

The insured agrees:
A. unless otherwise approved in writing by the insurers, to declare all shipments made under *insured transactions* under a Transaction Endorsement (Repetitive Sales-Single Buyer) and to accompany such declaration with the appropriate premium payment for

Article III.A.2 of the repetitive-sale policy covering the GMODC vehicles listed in Invoices 38601 to 38605 provides:

### III. INSURED TRANSACTION

A. *"insured transaction"* means a sale or sales approved by the Insurers on the conditions specified in the Transaction Endorsement; provided the products sold are: ...

2. produced or manufactured in the United States; ...

It is unclear whether the parties disagree about the facts relating to the actual construction of the vehicles.[9] Taking the view most favorable to TEFCO, as we must for purposes of FCIA's motion for summary judgment, the "Chevrolets [,which are the vehicles in question,] were designed in the United States, research and development was conducted in the United States, most of the parts and components were made in the United States, it was marketed from the United States and shipped from a United States port subject to United States laws." Rogers Aff. at ¶ 19. TEFCO concedes that it "belie[ves]" the component parts were "assembled ... [into the fin-

ished vehicles] in a Canadian town neighboring Detroit, Michigan for return sale in the United States." [10] Amico Aff. at ¶ 54; Rogers Aff. at ¶ 19.

The phrase "produced or manufactured in the United States" is defined nowhere in the policy. FCIA urges that the term should be read so as to exclude goods, such as the vehicles in question, which are assembled outside of the United States. TEFCO, of course, contends that the vehicles should not be excluded from coverage because "a majority of each vehicle['s] value was produced in this country." Plaintiff's Memorandum of Law at 37.

TEFCO urges that in choosing between these two possible interpretations, the Court should be guided by those rules of construction that hold that ambiguities should be construed in favor of the insured, *see, e.g., H.S. Equities v. Hartford Acc. & Indem. Co.,* 661 F.2d 264, 272 (2d Cir.1981), and that the insurer must demonstrate that its construction is the only one possible. *See, e.g., Vargas v. Insurance Co. of North American,* 651 F.2d 838, 840 (2d Cir.1981). TEFCO further contends that absent any direction to the contrary, the

---

such shipments, on or before the 15th day of the month immediately following the month of shipment: ...

While the parties dispute whether the required shipment reports were timely filed by TEFCO, *see* Defendant's Memorandum at 14 n. *, they do agree that TEFCO did not make the required premium payment of $23,000. *See* Affidavit of Steven E. Rogers, Director of International Operations of the Trend Group, Ltd., Parent Company of TEFCO ("Rogers Aff.") at ¶ 26.

Despite the concession by plaintiff that it did not make the required payments, plaintiff nevertheless alleges a pattern or practice by defendant in its course of dealing with plaintiff that includes the acceptance by defendant of late premiums, *see* Amico Aff. at ¶¶ 65, 67 and 77, and advance premiums, *id.* at ¶ 75, and the retention by defendant of overpayments made on shipments, *id.* at ¶ 79. If they occurred, these actions by FCIA could have led TEFCO to believe that its shipments under Invoices 38601 to 38605 were covered and would "estop the insurer [from] denying coverage under this policy." *Val Drugs v. Lynn,* 402 F.Supp. 174, 177 (W.D.N.Y.1975). *See also Hartford Co. v. Unsell,* 144 U.S. 439, 449–50, 12 S.Ct. 671, 674, 36 L.Ed. 496 (1892); *Reliance Ins. Co. v. The Yacht Escapade ex The Thor II,* 280 F.2d 482 (5th Cir.1960). This is especially so if the Court were to apply

New York law rather than federal common law as the Third Circuit has indicated is appropriate. *See Lovell, supra,* note 2.

9. The invoices in question each contain a sworn certification that the "country of origin" of the vehicles is the "Dominion of Canada." *See* Exhibit 17 to Coffey Aff. at ¶ 19. FCIA, of course, strenuously argues that as a matter of law the goods were "produced and manufactured" in Canada, it is not clear whether they claim as a factual matter that any physical construction other than the assembly of the components into vehicles took place there.

10. While TEFCO avers that it needs more discovery to determine with certainty that the components were manufactured in the United States, Plaintiff's Memorandum of Law at 24, it makes no such claim with respect to its "belief" that the goods were assembled in Canada. Thus, the Court must assume that TEFCO does not contest that the goods were indeed assembled in Canada. Based on these facts we must determine whether FCIA acted properly in denying TEFCO's claim on Invoices 38601 to 38605 on the ground that the products cited therein were not "produced or manufactured in the United States."

phrase should be given its ordinary meaning as understood by "the average businessman engaged in FCIA's course of business," Plaintiff's Memorandum of Law at 22 (citing, *inter alia, Vargas, supra,* 651 F.2d at 840), and that an export financier such as TEFCO would read the phrase so as to cover the shipment in question. Moreover, TEFCO argues, its construction is in accord with the purpose behind the export credit insurance program—namely, aiding in the financing and facilitating of exports and imports between the United States and foreign countries, 12 U.S.C. § 635(a)(1)—as "[i]t is difficult to imagine a more singularly American product than a Chevrolet." Rogers Aff. at ¶ 19.

The difficulty with TEFCO's contentions, which are not entirely unpersuasive on their face, is that they fail to take account of extrinsic evidence that aids in the interpretation of the policy.[11] Specifically, an FCIA brochure that was sent to TEFCO's insurance broker, Foreign Credit Brokerage, Inc., explains that "[a] medium term product [such as the GMODC vehicles in question] must normally be 100 percent of United States origin, but special consideration can be given upon application to contracts with a minor foreign content percentage." Exhibit 28 to Second Coffey Aff. at ¶ 8. No application for special consideration was made here. In addition to the evidence provided in the brochure, that substantial United States production of a good would not suffice to make the sale of that good an "insured transaction" can be inferred from the fact that the Master Policy issued by FCIA to TEFCO specifically provides coverage for cases of substantial United States production while the medium-term policy under which TEFCO makes this claim does not.[12]

TEFCO contends that this extrinsic evidence should be disregarded "in view of the obvious unequal bargaining positions of the parties." Plaintiff's Reply Memorandum at 37 n. *. This argument, which might be given some weight if made by a relatively powerless individual who had purchased a standard auto insurance policy, is meritless as made by TEFCO, a large, sophisticated corporation that has purchased commercial export insurance.

11. The Court is not persuaded by defendant's argument that the term "produced or manufactured in the United States" is a "term of art," the meaning of which can be derived from case law. Defendant's Reply Memorandum at 35. The cases cited by defendant in its reply memorandum, *Belcrest Linens v. United States,* 741 F.2d 1368, 1369 (Fed.Cir.1984) (emphasis added); *Uniroyal, Inc. v. United States,* 542 F.Supp. 1026 (1982), *aff'd per curiam,* 702 F.2d 1022 (Fed.Cir. 1983); *Texas Instruments, Inc. v. United States,* 681 F.2d 778 (C.C.P.A.1982); *United States v. Murray,* 621 F.2d 1163 (1st Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980), stand for the proposition that an article is the "growth, product or manufacture" of a country "if as a result of processes performed in that country a *new* article emerges with a *new* name, use or identity." *Belcrest Linens, supra,* 741 F.2d at 1369. While this definition supports defendant's position, each of the cases cited is a customs case. Although the definitions cited above may suffice for purposes of interpreting customs laws and determining whether import duties must be paid, it is not necessarily appropriate for determining whether certain goods are covered by the instant insurance policy.

For the same reason, we are unpersuaded by plaintiff's argument that the vehicles must have been produced or manufactured in the United States because they bear American licenses and such licenses are required only for goods produced or manufactured in the United States. That the term "produced or manufactured" is given one definition for purposes of determining whether that good requires a license does not mean that that definition should be used to determine the rights or obligations under an insurance contract. Finally, this same analysis leads us to reject plaintiff's contention that the goods must have been produced or manufactured in the United States because a United States Chamber of Commerce certification was issued and such certification is required only for goods produced or manufactured in the United States.

12. The Master Policy provides in pertinent part:
Modification of Policy Restriction. Notwithstanding the limitation imposed by the definition in the policy of an *insured transaction* to mean sales of products produced or manufactured in the United States, any sales of products which, except for such limitation, would qualify as a Short Term sale hereunder, shall be an *insured transaction* provided that at least one-half of the value, exclusive of price markup of such products, has been added by labor or material exclusively of United States origin.
See Declarations, Item 5.4 to Policy No. 5D-1723, attached as Exhibit C to Amico Aff. at ¶ 16.

Nor are we pursuaded by TEFCO's arguments regarding waiver, estoppel and materiality. Regarding waiver and estoppel, plaintiff has failed to make any showing that either of these doctrines should apply. With regard to materiality TEFCO's contentions are unsound even if one assumes *arguendo* that New York law should apply, that pursuant to such, an insurance policy cannot be forfeited by an immaterial breach of warranty, and that the Canadian assemblage was such an immaterial breach of warranty. We are not dealing here with a *forfeiture* of a policy. Rather, we are dealing only with one transaction under a policy that covers many potential transactions. The transaction in question simply has failed to qualify as an "insured transaction" as that term is defined in the policy. And under New York law, an insurer "has the right to determine what and whom it will insure." *Mobil Oil Corporation v. Reliance Insurance Co.*, 69 Misc.2d 876, 332 N.Y.S.2d 532, 534 (N.Y.S.Ct.1971), *aff'd mem. op.*, 39 A.D.2d 839, 333 N.Y.S.2d 747 (1972). *See also Erie County v. Continental Casualty Co.*, 268 A.D. 603, 52 N.Y.S.2d 627, 628 (1944), *aff'd mem. op.*, 295 N.Y. 956, 68 N.E.2d 48 (1946).

For these reasons, defendant's motion for summary judgment in granted as to that part of plaintiff's action that is based on claims for the sale of the GMODC vehicles enumerated on Invoices 38601 to 38605.

## IV. PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

As should be clear from all the above, plaintiff is not entitled to summary judgment on any part of its claim as it has thus far failed to affirmatively prove that it has met those conditions that trigger defendant's duty to pay on the policies.

## OTHER MOTIONS

Defendant has requested that discovery be stayed "until 30 days after the Court's ruling on the motion for summary judgment." Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Stay Discovery at 3.

This motion is denied; both parties may conduct discovery toward the ultimate resolution of the fact issues remaining in this case so long as such discovery has not been precluded by this Opinion.

Defendant has also moved pursuant to Rules 13 and 15(a), F.R.Civ.P., for leave to amend its counterclaim. It's present counterclaim seeks a declaratory judgment that the insurance policies that are at issue in this action are void and that all claims made thereunder are forfeited. The proposed amendments, which state permissive rather than compulsory counterclaims, seek similar relief under different insurance policies issued by FCIA to TEFCO. These policies involve transactions with the Jahshan Trading Co. of Amman, Jordan. The transactions are unrelated to those involving El Wahab. Plaintiff opposes this amendment on the ground that the proposed counterclaims would unduly complicate an already complex litigation and because plaintiff has previously filed a separate suit regarding the Jahshan policies, *Trend Export Funding Corporation and the Trend Group, Ltd. v. Foreign Credit Insurance Ass'n.*, 85 Civ. 1573 (S.D.N.Y. filed Feb. 27, 1985), which is also pending before this Court.

We agree with plaintiff. Addition of a counterclaim is within the discretion of the court. *Ralli v. Tavern on the Green*, 566 F.Supp. 329, 332 (S.D.N.Y.1983). While such additions are generally granted, *see id.*, for the reasons urged by plaintiff, the proposed counterclaims are inappropriate here.

Defendant's motion for leave to amend its counterclaim is denied.

## CONCLUSION

Defendant's motion for summary judgment is granted insofar as it relates to claims by plaintiff for payment under the repetitive-sale policy for the GMODC vehicles listed on Invoices 38601 to 38605. That part of defendant's summary judgment motion that goes to the remainder of plaintiff's claim is denied with leave to renew after further discovery is conducted pursuant to this Opinion. Plaintiff's cross-

motion for summary judgment is denied. Defendant's motion for a stay of discovery is denied as plaintiff may engage in the limited discovery described herein. Defendant's motion to amend its counterclaim is denied.

SO ORDERED.