777 F.2d 894
 LOVELL MANUFACTURING, a DIVISION OF PATTERSON-ERIE
CORPORATION, Appellant,
v.
EXPORT-IMPORT BANK OF the UNITED STATES and Aetna Casualty
and Surety Company, Inc., Aetna Insurance Company, American
Mutual Liability Insurance Company, Atlantic Mutual
Insurance Company, Commercial Union Insurance Company,
Continental Casualty Company, Continental Insurance Company,
Employers Insurance of Wausau, Federal Insurance Company,
Fireman's Fund Insurance Company, Hanover Insurance Company,
Hartford Insurance Company, Liberty Mutual Insurance
Company, Lumbermans Mutual Casualty Company, Reliance
Insurance Company, Royal Indemnity Company, St. Paul Fire
and Marine Insurance Company, Travelers Indemnity Company,
and United States Fire Insurance Company, t/d/b/a Foreign
Credit Insurance Association and Foreign Credit Insurance
Association, individually and as agent of all of the above Appellees.
 No. 85-3061.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 4, 1985.
Decided Dec. 5, 1985.
As Amended Dec. 17, 1985.
 
 James T. Marnen, (Argued), Knox Graham McLaughlin Gornall and Sennett, Inc., Erie, Pa., for appellant.
 William J. Schaaf, Marsh, Spaeder, Baur, Spaeder & Schaaf, Erie, Pa., for Foreign Credit Ins. Assoc. and Member Ins. Companies as individual appellees.
 Debra L. Kasper (Argued), Civil Div., Commercial Litigation Branch, U.S. Dept. of Justice, Washington, D.C., for Export-Import Bank of the U.S., appellee.
 Before WEIS and MANSMANN, Circuit Judges, and RE, Chief Judge.*
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In this appeal we are asked to decide if summary judgment was properly granted in favor of an insurance company in this action brought by its insured on a policy covering commercial risks. Because we find that the district court erred as a matter of law in applying to the insurer the more stringent estoppel criteria applicable to government agencies instead of the traditional equitable estoppel criteria, we reverse and remand the case for application of the appropriate estoppel standard.
 
 I.
 
 2
 Plaintiff Lovell Manufacturing (Lovell), a division of Patterson-Erie Corporation, is a Delaware corporation engaged in the business of manufacturing and selling washing machine parts. While its principal place of business is Erie, Pennsylvania, many of its sales involve shipment into foreign countries. As a regular business practice, Lovell secures insurance on these sales in order to protect itself against the commercial risks and political risks inherent in dealing with business entitles abroad.
 
 
 3
 The policies at issue here were purchased by Lovell from the defendant Foreign Credit Insurance Association (FCIA). FCIA is an association of private insurance companies which was established in 1961 at the encouragement of the United States Export-Import Bank (Eximbank), also a defendant herein.
 
 
 4
 Between December 10, 1980 and December 31, 1982, Lovell was insured under a "Master Export Insurance Policy" issued by FCIA. From January 1, 1983 to January 1, 1984, it was insured by a second "Master Export Insurance Policy" also issued by FCIA. Both policies insured Lovell against defaults of its foreign creditors with respect to goods sold which were due to "Commercial Credit Risks" and "Political Risks." These policies included coverage regarding sales of goods to Metalurgica Nacional C.A. (Menaca) of Maracaibo, Venezuela.
 
 
 5
 According to the policies, FCIA was the sole insurer with respect to commercial credit risks and Eximbank was the sole insurer with respect to political risks.
 
 
 6
 The original policies provided for reimbursement for 100 percent of covered losses resulting from political risks. With respect to commercial credit risks, the policies contained an aggregate limit of liability on all claims of $500,000 and a maximum recovery of 90% of each loss up to $30,000 per customer reduced by a deductible of $10,000. The $30,000 limit was referred to in the policies as the "Multiple Discretionary Credit Limit."
 
 
 7
 In order to cover sales to a customer for an amount in excess of the Discretionary Credit Limit or under terms not permitted in the Discretionary Credit Limit, the terms of the policy required that Lovell submit an application for a Special Buyer Credit Limit (SBCL) together with credit information on the potential customer.
 
 
 8
 In February, 1981, Mr. Abowd, Vice President and Treasurer of the Patterson-Erie Corporation, submitted an application for an SBCL on behalf of Lovell. Aware that a guaranty would be required to obtain the SBCL, Abowd attached to the application a copy of a July 25, 1980, letter of guarantee from Ceteco de Caracas (Ceteco), the parent company of Menaca. The letter read as follows:
 
 
 9
 We herewith unconditionally guarantee the payment to Lovell Manufacturing Company by our subsidiary Metalurgical Nacional, C.A. (Menaca), Maracaibo, Venezuela.
 
 
 10
 This guarantee is for all unpaid invoices in the event that such subsidiary fails to pay within the established terms of sale.
 
 
 11
 This guarantee is effective January 1, 1980 and is valid for an unspecified time as long as Menaca is a wholly owned subsidiary of Ceteco de Caracas, S.A. It should also be understood that in case government regulations alter the situation what payments are concerned (sic) that this guarantee might have to come up for alteration.
 
 
 12
 On April 3, 1981 Mr. Abowd received a letter dated March 23, 1981 from William Mason, Assistant Underwriting Manager of FCIA, confirming a telephone conversation of March 18, 1981 declining the application and requesting "current financial statements on the buyer and the guarantor in order to reconsider (Lovell's) request". The letter explained that "even though the buyer appeared capable", it (FCIA) felt that "the dated information ... was not sufficient to justify approval." No reference was made to the submitted guaranty letter.
 
 
 13
 On April 21, 1981, Mr. Abowd resubmitted to FCIA the SBCL application, enclosing a financial statement concerning Ceteco, the guarantor. Thereafter, a policy endorsement was approved, effective April 1, 1981 to April 30, 1982, providing Lovell with an SBCL covering shipments to Menaca for payment of up to $500,000.
 
 
 14
 On December 28, 1982, Mr. Abowd submitted a request to FCIA for another increased SBCL and again enclosed a copy of the July 25, 1980, letter of guarantee from Ceteco. A policy endorsement effective May 1, 1982, was issued, providing Lovell with an SBCL covering shipments to Menaca for payment of up to $750,000 until April 30, 1983.
 
 
 15
 Both policy endorsements contained, as an express condition of coverage under the SBCL, the requirement that Menaca have the guarantee of Ceteco:
 
 
 16
 Coverage under this Special Buyer Credit Limit is conditioned upon the insured's obtaining and maintaining as valid and enforceable the unconditional and irrevocable guarantee of Ceteco de Caracas, S.A., of Venezuela.
 
 
 17
 In reliance upon the increased coverage provided by the two SBCL endorsements, Lovell extended credit to Menaca totaling $763,194.83.
 
 
 18
 In October 1983, Lovell submitted to FCIA a notice of claim and proof of loss form dated October 14, 1983, claiming a net loss of $583,747.66 on shipments made to Menaca from August through December, 1982. Lovell also submitted to FCIA another notice of claim and proof of loss form dated October 14, 1983, claiming a net loss of $179,447.17 on shipments made to Menaca in January and February, 1983. Since Lovell asserted coverage under the Political Risks section of the policies, FCIA forwarded the claims to Eximbank for processing.
 
 
 19
 Because Lovell had not submitted any evidence with its claims of its compliance with the guarantee requirement of its policy, Eximbank notified Lovell on January 10, 1984, that a decision on its claim for $583,747.66 was being delayed due to Lovell's apparent noncompliance with the special condition requiring it to have the guarantee of Ceteco. On February 2, 1984, after receiving a copy of the letter of guarantee, Eximbank notified Lovell that the processing of the claim was being further delayed because Eximbank's attorneys had "determined that the existing guarantee is deficient." Lovell was asked to provide a new written guarantee. On March 23, Eximbank sent a telex to Lovell stating that Eximbank's Venezuelan counsel had determined that the guarantee of Ceteco which Lovell had furnished to Eximbank was deficient and suggesting guarantee language which Venezuelan counsel had advised would be sufficient under Venezuelan law.
 
 
 20
 On June 25, 1984, Eximbank denied Lovell's claims on the basis of Lovell's failure to comply with the policy condition.
 
 II.
 
 21
 On April 3, 1984, Lovell filed this action against both FCIA and Eximbank, alleging commercial credit risk claims and political risk claims;[1] under the express terms of the policies, FCIA was responsible for the commercial credit risks and Eximbank for the political credit risks.
 
 
 22
 On June 11, 1984, FCIA and Eximbank filed a motion for summary judgment. Lovell responded by filing a cross-motion for summary judgment, affirmatively asserting estoppel as a basis for recovery. By an order dated November 9, 1984, the district court denied both motions and set the case for trial on two issues: 1) whether the facts established a waiver or estoppel and 2) whether the losses resulted from political or commercial risks.
 
 
 23
 Thereafter, Lovell withdrew its political risks claims and FCIA and Eximbank stipulated to FCIA's receipt of copies of the letter of guaranty as alleged by Lovell. A renewed motion for summary judgment was filed by FCIA and Eximbank to which Lovell responded by renewing its cross-motion for summary judgment.
 
 
 24
 By order dated January 3, 1985, 599 F.Supp 961, the district court granted the motion for summary judgment filed by Eximbank and FCIA and denied Lovell's cross-motion. The district court held that FCIA was acting as a government agent of Eximbank and therefore, the higher standards for establishing estoppel against the government were applicable. The court then concluded that Lovell had not shown the affirmative misconduct necessary to establish estoppel against FCIA as a government agency. This appeal resulted.
 
 
 25
 On appeal Lovell asserts that the traditional equitable estoppel standards rather than the governmental estoppel standards should have been applied by the district court since FCIA, a private entity and not a governmental agency, is the sole obligor on the commercial credit risk claim at issue. To counter, FCIA contends that it acted as an agent of Eximbank in offering and securing the commercial credit risk coverage. As such, FCIA argues that it is entitled, as the district court so found, to be judged, for estoppel purposes, by the more stringent standard applicable to governmental agencies.
 
 
 26
 We must determine, therefore, the relationship of FCIA to Eximbank with respect to the underlying claim for commercial credit risks in order to decide the applicable estoppel standard. Because all parties concede that there are no factual disputes, we are concerned only with questions of lawnamely, the agency relationship and the appropriate estoppel standard. Accordingly, our scope of review is plenary. Tustin v. Heckler, 749 F.2d 1055, 1060 (3d Cir.1984).
 
 III.
 
 27
 The conduct upon which Lovell relies for its estoppel claim is the conduct of FCIA; specifically, Lovell cites the failure of FCIA to ascertain and notify Lovell of the legal insufficiency of the guarantee. In reliance on the issuance of the SBCL endorsements received from FCIA, Lovell notes that it paid the premiums thereon and sold products to Menaca totaling $763,194.83. Lovell now complains that it was not until almost three months after it filed its claim and after three years of premium payments that either FCIA or Eximbank questioned the adequacy of the guaranty, of which FCIA had a copy before it issued the increased SBCL coverage. Accordingly, Lovell contends that FCIA should be estopped from denying insurance coverage.
 
 
 28
 Estoppel is an equitable doctrine invoked by courts to preclude a party from asserting a claim or a defense which is premised upon that party's own wrongdoing. Estoppel requires 1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; 2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and 3) detrimental reliance by the other party upon the state of things so indicted. Federal Deposit Insurance Corp. v. Harrison, 735 F.2d 408, 413 (11th Cir.1984). See also Rosen v. Hotel and Restaurant Employees and Bartenders Union, 637 F.2d 592 (3d Cir.1981), cert. denied 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); United States ex rel. K & M Corp. v. A & M Gregos, Inc., 607 F.2d 44 (3d Cir.1979).
 
 
 29
 Recently, the Supreme Court had occasion to review this doctrine in Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Explaining the operation of the doctrine, the Heckler Court wrote:
 
 
 30
 Estoppel is an equitable doctrine invoked to avoid injustice in particular cases. While a hallmark of the doctrine is its flexible application, certain principles are tolerably clear.
 
 
 31
 "If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled
 
 
 32
 "(b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired." Restatement (Second) of Torts Sec. 894(a) (1977).
 
 
 33
 Thus, the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse," and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading. See Wilber Nat. Bank v. United States, 294 U.S. 120, 124-125, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935).
 
 
 34
 Id. 104 S.Ct. at 2224.
 
 
 35
 As a rule, courts have been reluctant to apply estoppel against the government. This judicial reluctance is based upon considerations of sovereign immunity, separation of powers and public policy, such as the fear of binding the government by the improper acts of its agents due to fraud and collusion or of the severe depletion of the public treasury. Community Health Services v. Califano, 698 F.2d 615, 621 (3d Cir.1983), rev'd on other grounds, 104 S.Ct. 2218 (1984).[2] The Supreme Court continues to manifest reluctance to apply estoppel against the federal government. This is clearly evidenced in Heckler, where once again the Court recognized that estoppel may be applied against the government under certain circumstances but specifically failed to define the type of conduct which would sustain a successful estoppel claim. Heckler at 2224. We have held, however, that "affirmative misconduct" on the part of the government would entitle a petitioner to invoke estoppel against the government. Community Health Services, supra at 621; Yang v. INS, 574 F.2d 171, 174-75 (3d Cir.1978).
 
 
 36
 Whether governmental estoppel principles or the traditional equitable estoppel principles are applicable here is determined by the underlying claim for commercial credit risk insurance coverage and the relationship between Eximbank and FCIA as it relates to this claim. That is, we must decide if FCIA was acting as the government agent of Eximbank with regard to the commercial credit risk so that the higher standards for establishing estoppel against the government are applicable. To make this determination, we must begin with the applicable statutory authority and the agency agreement executed between Eximbank and FCIA.
 
 IV.
 
 37
 Congress created Eximbank as an agency of the United States Government under the Export-Import Bank Act of 1945, ch. 341, Sec. 2, 59 stat. 526, to "aid in financing and to facilitate exports and imports and the exchange of commodities and services between the United States ... and any foreign country...." 12 U.S.C. Sec. 635(a)(1). Among other things, the Act authorizes Eximbank to "insure, coinsure and reinsure against political and credit risks of loss." Id. To achieve this, the Act permits Eximbank to issue insurance in conjunction with "insurance companies ... or groups thereof," and to employ such insurance companies or groups of insurance companies "to act as its agent in the issuance or servicing of such ... insurance, coinsurance and reinsurance, and the adjustment of claims arising thereunder." 12 U.S.C. Sec. 635(c)(2).
 
 
 38
 Pursuant to the Act, Eximbank in 1961 encouraged a group of the nation's insurance carriers to join in creating the FCIA in order to provide protection for American exporters against certain commercial risks inherent in foreign credit sales and to assist it (Eximbank) in protecting these exporters against potential political risks abroad.
 
 
 39
 For over twenty years, Eximbank and FCIA have entered into a series of agency agreements under which Eximbank has appointed and reappointed FCIA as its agent for the purpose of marketing and issuing export credit insurance. The agency agreement in effect when Lovell's Master Export insurance policies were issued was executed on October 1, 1977 (1977 Agency Agreement).
 
 
 40
 In Part B of the 1977 Agreement, outlining the General Provisions, the agreement provides that FCIA, pursuant to Part C--the Agency Provisions, "shall act as the agent of Eximbank in connection with insurance policies issued by [FCIA]." However, the agreement then clearly delineates the division of responsibility with regard to the insurance policies issued. That is, the agreement explicitly provides that, "[u]nder such policies [FCIA] shall be the sole insurer with respect to Commercial Credit Risks ... and Eximbank shall be the sole insurer with respect to Political Risks, Sovereign Transactions and Commercial Credit Risks for the sole account of Eximbank." "Commercial Credit Risks for the sole account of Eximbank" are defined in Article 3, Part B of the agreement and include those risks which FCIA has declined to accept and Eximbank has elected to accept. In this situation, the agreement stipulates that Eximbank is the sole insurer of the commercial credit risks and FCIA is to "act in no other capacity than as agent for Eximbank in such transaction." This distinct division of responsibility with regard to commercial credit risks and political risks is reiterated in Section I of both Master Export Credit Insurance Policies issued to Lovell.
 
 
 41
 We note parenthetically that the commercial credit risks at issue here were not "for the sole account of Eximbank" as defined in Article 3, Part B; rather, FCIA, in issuing the insurance policies to Lovell, had accepted the commercial credit risks sought to be covered by Lovell and so became, under the explicit terms of the 1977 agency agreement as well as of the Master Export Insurance Policies, the sole insurer of those credit risks.
 
 
 42
 Part C, in outlining the agency provisions of the 1977 agreement, states that Eximbank appoints FCIA "for the purpose of representing and administering Eximbank's interest in all insurance policies issued by [FCIA]" (emphasis supplied). As specifically set forth in Part B of the 1977 agreement, Eximbank's interest in the insurance policies is circumscribed to "Political Risks, Sovereign Transactions and Commercial Credit Risks issued for the sole account of Eximbank". It is only with respect to these three areas of interest, where Eximbank is the sole insurer, that FCIA functions as the agent of Eximbank. In all other respects, FCIA is, by the very terms of the agreement, the sole insurer of commercial credit risks.
 
 
 43
 When functioning in its agency capacity, FCIA has, under the provisions of Part C, the delegated authority, among other things, to issue insurance policies, to administer and service matters relating to the insurance policies issued, to collect all premiums due Eximbank and to take all necessary action relating to salvage operations.
 
 
 44
 Particularly with regard to FCIA's delegated authority to issue policies, the agreement emphasizes at Part C, Article 2(a), that FCIA may issue policies "and thereby commit Eximbank as the sole insurer of insurance relating to Political Risks, Sovereign Transactions or Commercial Credit Risk insurance issued by [FCIA] for the sole account of Eximbank" (emphasis supplied). This is consistent with the other policy provisions and the delineation of responsibility. Accordingly, in the policies issued to Lovell, FCIA did commit Eximbank as the sole insurer of the political risks. The fact remains, however, that with respect to the commercial credit risks before us, FCIA was and remained the sole insurer on these risks.
 
 
 45
 The defendants further argue, citing Part C, Article 2(a), that FCIA has the authority to commit Eximbank "as the reinsurer of all other Commercial Risk Insurance pursuant to the provisions of The Reinsurance Agreements".
 
 
 46
 Defendants point out that on October 1, 1977 Eximbank and FCIA were signatories to a reinsurance agreement with regard to FCIA's liability under the commercial credit risk coverage of policies issued to insureds such as Lovell. Under this reinsurance agreement, Eximbank agreed to reinsure FCIA's losses in excess of certain amounts per one buyer, per group of buyers and per country.
 
 
 47
 On September 23, 1983, a revised reinsurance agreement was executed. Therein, Eximbank agreed to pay FCIA the full amount by which its net losses in a given year in connection with the export credit insurance program exceeded its net premiums. In return, FCIA paid Eximbank a premium under both reinsurance agreements for such coverage.[3]
 
 
 48
 Subsequent to the execution of the September 23, 1983, revised reinsurance agreement, the members of FCIA, under a separate agreement, paid into FCIA a sum of money in satisfaction of all of FCIA's known potential liability under the prior reinsurance agreements. This sum of money was exhausted in the payment of claims as of December 11, 1984. Therefore, claims not paid but which relate to the provisions of the agreement, including the claim involved in this action, must be paid by Eximbank.
 
 
 49
 Citing to these facts, defendants argue that the public fisc is being placed at risk, since Eximbank is a government agency, 12 U.S.C. Sec. 635(a)(1), whose obligations are public debt transactions backed by the full faith and credit clause of the United States. Accordingly, defendants urge the application of the higher governmental estoppel principles. See e.g. Heckler v. Community Health Services, supra, Schweiker v. Hansen, supra.
 
 
 50
 Defendants, however, have misplaced the focus of the case. So, too, did the district court shift the focus incorrectly when it concluded that FCIA, although sole insurer of the commercial credit risk coverage, was a government agent since the reinsurance agreements "make it clear that ... the Commercial Credit risk coverage ... is a heavily subsidized insurance endeavor in which the government assumes a major part of the risk involved." While this may be true, FCIA did not commit Eximbank in the insurance agreements issued to Lovell, pursuant to Article 2(a), Part C of the 1977 Agency Agreement, as the reinsurer of the commercial credit risks. There is no provision in either of Lovell's policies outlining any reinsurance coverage. Under the specific terms of The Master Export Credit Insurance Policies issued to Lovell, and the subject of this litigation, FCIA remains the sole insurer.
 
 
 51
 The reinsurance agreements only run between Eximbank and FCIA. The fact that FCIA must now look to Eximbank for recoupment on Lovell's claim, pursuant to an entirely separate agreement to which Lovell was not a party, does not affect the duties owed to Lovell by FCIA under the insurance policies it issued. The obligation to Lovell resides with FCIA and not with Eximbank. Moreover, it is FCIA's potential claim against the government under the reinsurance agreements, and not Lovell's, which is directed toward the public fisc; this is not the case before us.
 
 
 52
 In the matter sub judice, FCIA acted independently as sole insurer when it issued the policies to Lovell, and under the express terms of those policies it is liable for the commercial credit risk claims now asserted.
 
 
 53
 As such, the estoppel question raised is to be judged by the traditional equitable estoppel principles and not according to the more stringent test applied when a government agency is involved.
 
 V.
 
 54
 For these reasons, we will reverse the order of the district court and remand the case for consideration of the appropriate estoppel standard.
 
 
 
 *
 Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 The action was initiated in the Court of Common Pleas of Erie County, Pennsylvania and was later removed to the United States District Court for the Western District of Pennsylvania
 
 
 [2]
 For other cases involving governmental estoppel, see e.g. INS v. Miranda, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam); Schweiker v. Hansen, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)
 
 
 [3]
 Under the October 1, 1977 reinsurance agreement, the premiums were defined as follows:
 Article 3--Premiums for Eximbank Reinsurance
 The parties agree that Eximbank's 20% share of the premiums received under Comprehensive Insurance policies in which the Association retains the Commercial Credit Risk for its sole account, subject to the reinsurance provided herein (including premiums payable in respect of the Political Risk portion of such Comprehensive Insurance) as set forth in Article 4 of Part B of the Agency Agreement shall be deemed to be compensation to Eximbank for its services under such Comprehensive Insurance policies as reinsurer of Commercial Credit Risks of the Association and sole primary insurer of Political Risks under such policies.
 Under the September 23, 1983 reinsurance agreement, the premiums were defined as follows:
 Article 3--Premiums for Eximbank
 The parties agree that all Premiums received by the Association shall be deemed to be compensation to Eximbank for its services as sole reinsurer of Commercial Credit Risks of the Association and sole primary insurer of Political Risks under insurance policies written by the Association. Net Premiums received by the Association in excess of Net Loss in any syndicate Year shall be paid to Eximbank at such times and in such manner as Eximbank shall direct.