**LOVELL MANUFACTURING COMPANY, A DIVISION OF PATTERSON–ERIE CORPORATION**

v.

**EXPORT–IMPORT BANK OF the UNITED STATES, et al.**

**Civ. A. No. 84–143 Erie.**

United States District Court,
W.D. Pennsylvania.

Jan. 28, 1987.

**64**

James Mornen, Erie, Pa., for plaintiff.

J. Alan Johnson, U.S. Atty., Pittsburgh, Pa., for U.S.

Daniel Loeb, Civ. Div. Dept. of Justice, Washington, D.C., for Export-Import.

Henry A. Hubschman, Washington, D.C., for Foreign Credit Ins. Ass'n.

## OPINION

GERALD J. WEBER, District Judge.

This is an action to enforce an insurance contract between plaintiff Lovell Manufacturing Company ("Lovell"), the manufacturer of washing machine parts, and defendants Export-Import Bank of the United States ("Eximbank") and Foreign Credit Insurance Association ("FCIA"), who issued and reissued an insurance policy to cover certain relevant shipments of washing machine parts to Menaca, a Venezuelan corporation. The essential facts of this case are not in dispute, and are set forth in the Joint Partial Stipulation of Fact as well as in affidavits separately filed. Procedurally, this case has taken a circuitous route to get to its present position having been subject to two prior summary judgment motions and an appeal. The case is now before us on remand from the Third Circuit, and the parties have filed cross-motions for summary judgment. These motions have been fully briefed and are ready for our consideration.

Two legal issues remain in dispute. The first requires us to determine whether FCIA, the sole insurer with respect to the "Commercial Credit risks" insurance coverage applicable herein, either waived a condition precedent to this coverage or is now estopped from asserting such a condition.[1] The condition precedent which FCIA is attempting to enforce is the requirement that Lovell obtain an unconditional guarantee of Menaca's indebtedness from Cetico, a large Venezuelan corporation of which Menaca was a wholly owned subsidiary. Plaintiff argues that FCIA's actions in accepting Lovell's insurance application and supporting information, and in thereafter issuing an insurance policy and accepting Lovell's premiums, constituted an implied waiver of the right to enforce the condition precedent.

### FACTS

The parties have placed before the court numerous exhibits, an extensive "partial" stipulation of facts, as well as separately filed affidavits providing a detailed and somewhat complicated factual situation. We do not intend to recite every fact that the parties have included in the record for our consideration, but we find certain facts are central to an understanding of our decision. We will therefore attempt to state them in as simple a manner as possible.

Prior to 1980, Lovell sold washing machine parts to Menaca on ninety-day credit terms. In mid–1980, Lovell's competitors offered Menaca 180–day credit terms on such sales. Lovell wanted to remain com-

---

1. The Third Circuit ruled that traditional equitable estoppel principles would apply in this case, and not the more stringent test ordinary used when a government agency is involved. *See Lovell Manufacturing Co. v. Export-Import Bank of U.S. et al.,* 777 F.2d 894 (3d Cir.1985).

petitive, but was concerned about assuming the added risk that such an extension of unsecured debt would entail. Therefore, Lovell approached Ceteco, Menaca's parent corporation, for a guarantee of Menaca's debts. Ceteco sent Lovell a letter dated July 25, 1980 in which it extended a guarantee.[2] Lovell intended that this guarantee would provide it with some security on an interim basis until it could obtain export credit insurance. Subsequently, Lovell applied for such insurance from FCIA and Eximbank.

FCIA issued a "Master Export Credit Insurance Policy", number SD–1538, on December 22, 1980, with effective dates of December 10, 1980, through December 31, 1981. On December 22, 1981, FCIA issued a renewal effective January 1, 1982, through December 31, 1982. Lovell paid the required premiums. Prior to December 10, 1980, Lovell had never been insured under any foreign credit insurance policy.

The Master Policy covered certain limited enumerated risks of non-payment from Lovell's foreign customers under a discretionary credit limit in amounts up to either $20,000 or $30,000 per transaction depending on the payment terms. During the renewal period from January 1, 1982, through December 31, 1982, the policy's aggregate limit of coverage for all transactions was raised from $500,000, the original limit, to $750,000. The master policy included a provision that a condition precedent to the insurer's liability was full compliance with all terms. *See* article X. The policy also contains a provision which essentially prohibits anything but a written waiver of compliance with all conditions. *See* article XI.I.

The problem with the master policy was that it didn't really meet Lovell's needs in terms of foreign credit insurance unless Lovell could also obtain what was referred to as a Special Buyer Credit Limit. Lovell's estimated volume of sales to Menaca, which was Lovell's only foreign customer at the time, were expected to be greatly in excess of the master policy's $30,000 and $20,000 discretionary credit limit per transaction. Before applying for insurance, Lovell informed FCIA of the fact that Lovell wanted the insurance in question only if it could obtain the special buyer credit limit. FCIA informed Lovell that the master policy had to be issued first before Lovell could apply for the special buyer credit limit. Lovell complied with this requirement and subsequently made application for the special buyer credit limit, including with the application its backup documentation and the July 25, 1980, Ceteco guarantee. The application was initially declined by FCIA which indicated that "current financial statements on the buyer and the guarantor (were needed) in order to reconsider ..." Lovell resubmitted its application with a financial statement on Ceteco and a reference to other information already in FCIA's files. FCIA issued the Special Buyer Credit Limit on May 21, 1981 covering sales from Lovell to Menaca in amounts up to $500,000 on 180–day open account payment terms. The original special buyer credit limit covered eligible shipments made between April 1, 1981, and April 30, 1982.

Lovell's special buyer credit limit lapsed on May 1, 1982. Nonetheless, between May 1, 1982 and December 27, 1982, Lovell made shipments to Menaca with a gross invoice value of $592,336.66.[3] At the time

---

**2.** The text of Ceteco's letter was as follows:

We herewith unconditionally guarantee the payment to Lovell Manufacturing Company by our subsidiary Metalurgica Nacional, C.A. (Menaca), Maracaibo, Venezuela.

This guarantee is for all unpaid invoices in the event that such subsidiary fails to pay within the established terms of sale.

This guarantee is effective January 1, 1980, and is valid for an unspecified time as long as Menaca is a wholly owned subsidiary of Ce-

teco de Caracas, S.A. It should also be understood that in case government regulations alter the situation what payments are concerned [*sic*] that this guarantee might have to come up for alteration.

Stipulation, Par. 8.

**3.** The invoice value of $592,336.66 on shipments from May to December, 1982 forms the basis for one of the two claims Lovell later made to FCIA. The second claim in question involved shipments made between January 26, 1983, and

of these shipments, Lovell's only coverage in effect was the discretionary credit limit of the master policy. Lovell belatedly made application for a second special buyer credit limit to cover these shipments on December 28, 1982. On January 18, 1983, Lovell received notification that FCIA had issued a second special buyer credit limit, which FCIA approved retroactively to cover the period from May 1, 1982 through April 30, 1983, in amounts up to $750,000.

The condition precedent was included in the "Notification, Special Buyer Credit Limit" issued by FCIA on May 21, 1981, as well as in the second notification of the Amended Special Buyer Credit Limit received on January 10, 1983. These notifications indicated in relevant part as follows:

Guarantee Clause

Coverage under this Special Buyer Credit Limit is conditioned upon the insured's obtaining and maintaining as valid and enforceable the unconditional and irrevocable guarantee of Ceteco de Caracas, S.A., of Venezuela.

At renewal times for the master policy or the special buyer credit limit, FCIA and Lovell corresponded as to what information FCIA required for reissuance. Lovell provided all information requested and, on at least one occasion (September 15, 1982), Lovell inquired as to whether FCIA needed any additional information. FCIA did not respond to this particular inquiry.

Neither party recalls any specific communication during the relevant period as to the adequacy of the Ceteco guarantee, or the requirements of the special buyer credit limit coverage aside from that set forth in the notifications. None of the parties consulted counsel to determine whether the Ceteco guarantee was unconditional and irrevocable. Lovell erroneously believed that the special buyer credit limit would cover any extension of credit made by Lovell to Menaca which occurred while Mena-

ca was a subsidiary of Ceteco and for which governmental regulations did not prohibit payment.

Overall, Lovell paid a total of $27,131.02 in premiums for coverage on shipments with a gross invoice value of $3,804,764. Following is an itemization of the premiums Lovell paid under the terms of the policy, as well as the gross invoice value of the sales, for the period covering May, 1982 through January 1983:

| MONTH | PREMIUM PAID | AMOUNTS OF SALES |
|---|---|---|
| 5–82 | $ 352.05 | $ 55,881.00 |
| 6–82 | 700.64 | 111,213.00 |
| 7–82 | 693.52 | 110,083.00 |
| 8–82 | 693.24 | 110,038.00 |
| 9–82 | 745.66 | 118,359.00 |
| 10–82 | 746.22 | 118,448.00 |
| 11–82 | 746.22 | 118,456.00 |
| 12–82 | 746.21 | 118,446.00 |
| 1–83 | 1,184.46 | 118,446.00 |

As of February 16, 1983, Menaca owed Lovell $771,813.83 which debt has not been paid. On October 14, 1983, Lovell submitted to FCIA two Notice of Claim and Proof of loss forms, the first claiming $583,747.66 and the second claiming $166,-252.34.[4] On January 10, 1984, Lovell was notified by Eximbank who was processing the claim at that time that Lovell's claim was being held in abeyance because Lovell had not complied with the condition that it provide Ceteco's guarantee. Lovell forwarded a copy of the Ceteco guarantee to Eximbank. On February 2, 1984, Lovell was notified that the guarantee was deficient under Venezuelan law and a new guarantee had to be obtained. Lovell made efforts to obtain a new guarantee and Ceteco provided a second, newly worded guarantee to Lovell. The wording in the second guarantee was also insufficient to meet the condition of the policy. After further contacts by Lovell, Ceteco indicated its unwillingness to supply the guarantee requested by Eximbank, indicating that its attorneys were of the opinion that such a guarantee was unlawful under Venezuelan law. Lo-

February 6, 1983, with a gross invoice value of $179,477.17. In total, these two claims amount to a gross invoice value of $771,813.83.

**4.** In the Abowd affidavit accompanying plaintiff's motion for summary judgment, plaintiff

explains that claims were made for less than the gross invoice value of the shipments (*see* footnote 3 *supra.*) because it was Lovell's belief that both claims were subject to one special buyer credit limit of $750,000.

vell filed this suit on April 3, 1984. Eximbank officially denied Lovell's claim for failure to obtain an unconditional and irrevocable guarantee from Ceteco.

Lovell indicates in the Abowd affidavit that had Lovell been aware that all conditions precedent had not been met, Lovell would not have continued to extend the 180–day open credit terms but would have reverted to the 90–day credit terms which were previously extended.

## IMPLIED WAIVER

Lovell asks us to find under these facts that FCIA impliedly waived the condition that Lovell obtain the unconditional and irrevocable guarantee of Ceteco. Under Pennsylvania law, when an insurance company has knowledge of facts inconsistent with one of the conditions precedent to coverage at the time it issues an insurance policy, and the insured is guilty of no fraud, the company may not later rely on such facts to show a breach of the condition in forfeiture of the coverage. *Pusti v. Nationwide Mutual Insurance Co.*, 415 Pa. 318, 203 A.2d 660 (1964); see also text and cases cited in 44 Am Jur 2d § 1636. The basis for the rule is the doctrine of implied waiver or waiver by estoppel. *Evans v. Metropolitan Life Insurance Co.*, 294 Pa. 406, 144 A. 294 (1928). The waiver may be implied from the conduct of the insurer which evidences an intent not to insist on some performance otherwise due, as a result of which the insured is induced to change its position to its detriment. *Government Employees Ins. Co. v. Steitz*, 397 F.Supp. 366 (E.D.Pa.1975).

■ We believe that in this case FCIA had knowledge of the nature of the CETECO guarantee before issuing the insurance coverage in question and was again made aware of this information prior to reissuance. FCIA, which was in the business of writing credit insurance, must be presumed to know what an unconditional guarantee was. *Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174 (3d Cir.1979). Lovell was in no way guilty of any fraud in regard to its applica-

tion or any representations it made in relation thereto. After receiving the "deficient" guarantee, FCIA in communications to Lovell referred to CETECO as a guarantor, asked for further financial information on CETECO and upon receipt of same, issued the coverage and accepted Lovell's premiums. We find that FCIA's failure to indicate to Lovell that the guarantee was insufficient and would lead to forfeiture of coverage unless corrected, resulted in Lovell's reliance on the assumption that it had successfully diminished its risk through insurance coverage therefore no further actions to protect Lovell's interests were necessary.

■ We do not believe that the policy language prohibiting any but a written express waiver precludes this result. *See Thomas v. Employers Liability Assurance Corp. Ltd. of London*, 284 Pa. 129, 130 A. 322 (1925); see also text and cases cited in 44 AM Jur 2d § 1607. Neither do we subscribe to defendants' argument that Lovell could not have relied to its detriment on any actions by FCIA in regard to its first claim since coverage had lapsed and no renewal application was made until after the shipments in regard to this claim had already been made. While this initially appears to be a good argument, it stops short of considering all the facts. It appears that Lovell did not know of the expiration of the Special Buyer Credit Limit. Uncontradicted evidence indicates that Lovell sold the goods during the period when coverage had lapsed in amounts which were in excess of the master policy limits but within the special buyer credit limit and that Lovell paid the premiums required by those shipments ($.63 per $100 of gross invoice value). The June 4, 1986 Abowd Affidavit indicates that an FCIA representative notified Lovell in late November or early December, 1982, that the special buyer credit limit had lapsed. Prior to that time, Lovell believed that the coverage had been renewed through December 31, 1982 which was the expiration date of the mas-

ter policy.[5] Moreover, FCIA issued the policy retroactively on January 18, 1983, having previously notified Lovell (January 11, 1983) that it would do so. At that point, Lovell may still have been able to collect on the debt or take additional steps to lessen its risk for the shipments involved in the first claim. We do not know if these efforts would have been successful. Nonetheless, Lovell did not make these efforts believing it was adequately insured. It was not until a month after the reissuance of coverage, on February 18, 1983, that the Government of Venezuela issued regulations concerning foreign currency exchange for repayment of foreign debts, an event which ultimately affected payment of the debt in question. Moreover, during the months following the announcement of new regulations, Lovell was uncertain about their impact on its business with Menaca. Lovell again applied for a reissuance of the special buyer credit limit at some time before May 27, 1983 and this was issued on June 3, 1983 with the added requirement that Lovell acquire a Venezuelan import license and register Menaca's debt with the Venezuelan government agency (RECADI) as set forth in the regulations issued February 18, 1983. Menaca has not been able to obtain RECADI approval of payment of the debt at the preferential currency exchange rate established by the February, 1983 regulations, despite having registered the debt, and the debt has not been paid. We believe that the facts support a finding that Lovell met all of the conditions which FCIA required of it prior to issuance and reissuance of the special buyer credit limit and that FCIA waived its right to belatedly assert a condition precedent after circumstances had substantially changed and Lovell no longer had other avenues available to limit its risk.

## CALCULATION OF DAMAGE CLAIM

 The parties' dispute in this area centers on whether Lovell's policy provided coverage for 90% of the gross value of its shipments (minus the deductible) or 80% for the period before January 1, 1983. The original policy provided that FCIA would pay 90% of any loss on an insured transaction resulting from a commercial credit risk, less the deductible. When the special buyer credit limit was reissued retroactive to May 1, 1982, the terms were changed to 80% coverage of these transactions. Lovell originally relied on some ambiguous wording in a letter it received from FCIA dated January 13, 1983 prior to the formal notification and express wording of the "Amendment of Special Buyer Credit Limit" which were received on January 26, 1983. We think that the wording of the formal notification is clear and controlling. All shipments covered by this policy, whether retroactively or prospectively, under the commercial credit risk coverage are insured at 80% coverage, subject to the deductible and $750,000 aggregate limit of coverage. Lovell belatedly concedes that this is the case in a Reply Brief, but argues over the calculation of the deductible. We have reviewed both parties' calculations and it appears that the differences are due to oversight in copying numbers or simple mistakes in arithmetic rather than policy or legal issues. In order to settle the matter, we find that the calculation should be as follows:

$750,000 (total limit of liability) multiplied by 80% equals $600,000, minus $10,000 deductible [6] equalling a total claim of $590,000 for which defendant FCIA is liable and to which plaintiff is entitled.

An appropriate order will be entered.

---

5. The effective dates and renewal dates of the master policy and the special buyer credit limit for the periods in question do not coincide. Although Lovell had been told that the effective dates would be made identical at some point, no specific date had been stated and there is no evidence that Lovell had been specifically informed that they had been made to coincide.

6. Since .8% of 771,813.83 is $6,174.51, the $10,000 alternative deductible should be used.