JONES MOTOR CO., INC., Plaintiff,

v.

TELEDYNE, INC. and The United
States of America, Defendants.

Civ. A. No. 86–358 LON.

United States District Court,
D. Delaware.

March 8, 1990.

Clark W. Furlow of Lassen, Smith, Kat-
zenstein & Furlow, Wilmington, Del. (Philip
W. Vogler of McCracken, Walker &
Rhoads, Philadelphia, Pa., of counsel), for
plaintiff.

Robert W. Whetzel of Richards, Layton
& Finger, Wilmington, Del. (James E. Gal-
latin, Jr. of Gaston & Snow, Boston, Mass.,
of counsel), for defendant Teledyne, Inc.

Patricia C. Hannigan, Dept. of Justice,
Wilmington, Del. (Captain Peter J. Comode-
ca, Litigation Atty., Dept. of Army, Wash-
ington, D.C., of counsel), for defendant
U.S.

OPINION

LONGOBARDI, Chief Judge.

Jones Motor Co., Inc. ("Jones Motor")
initiated this action against Teledyne, Inc.
("Teledyne") and the United States Govern-
ment ("United States") to recover unpaid
transportation charges of $62,100.00 for 54
shipments of tank engine parts shipped by
Jones Motor at Teledyne's request from
Muskegon, Michigan, to the harbor at Bal-

timore, Maryland. Docket Item ("D.I.") 1. Teledyne answered the complaint denying liability and cross-claimed against the United States seeking indemnification of the transportation charges pursuant to an express guarantee found on the bills of lading. D.I. 7, ¶ 24. The United States denies liability on the ground that the local contracting officer lacked the authority to issue the guarantee clause and that any equitable theories of relief are unavailable. D.I. 8. In an earlier opinion, this Court held that it had jurisdiction over Teledyne based upon diversity of citizenship, 28 U.S.C. § 1332, and the United States based on the Tucker Act, 28 U.S.C. § 1346. *Jones Motor Co., Inc. v. Teledyne, Inc.,* 690 F.Supp. 310, 317 (D.Del.1988). Jurisdiction for Teledyne's cross-claim against the United States is also properly based upon the Tucker Act, 28 U.S.C. § 1346.

## BACKGROUND

Teledyne and the United States, acting through the Army Tank Automotive Command, entered into Contract No. DAAEO7-82-0202 (the "Prime Contract") in April 1982. D.I. 7, Exhibit ("Ex.") B. The Prime Contract was for the production of an initial quantity of 1,277 tank engine parts, Mode AVDS Series 1790, and for delivery as specified by the contract. Of these engine parts, 323 were ordered on behalf of and for delivery to the Republic of Turkey pursuant to a Foreign Military Sales Agreement. Articles F–04 and F–06 of the Prime Contract required Teledyne to ship the engine parts "in accordance with the instructions of the Administrative Contracting Officer or his duly authorized representative." D.I. 7, Ex. B.[1] As required by the Prime Contract, Teledyne requested and received such shipping instructions from the United States Government Agency designated to administer the Prime Contract, Defense Contract Administrative Services Management Area ("DCASMA")

Grand Rapids in August, 1985. For each of the 54 shipments, DCASMA Grand Rapids instructed Teledyne to issue commercial bills of lading and to:

1. Annotate Freight Bills: "Prepaid, mail freight charges to following address:

　Prudential Lines, Inc.

　1 World Trade Center

　New York, NY 10048

　Attn: Bill Feyer"

2. Annotate Freight Bills: "Transportation charges are guaranteed by Transportation Office, DCASMA Grand, Rapids, MI 49504."

3. Initiate "No recourse Clause" on freight bill.

*See, e.g.,* Ex. 58–68. These instructions were provided by Ms. Ann Fick, who was the Transportation Officer, DCASMA of Grand Rapids, Michigan, in August, 1985, and the authorized agent of the Administrative Contracting Officer, Mr. J. James Young. Each of the 54 shipments transported by Jones Motor was made under a separate bill of lading and Teledyne followed these instructions in executing the 54 bills of lading at issue in the present suit. Although all of the bills of lading were annotated with the word "Prepaid", none of the bills of lading bore a designation "freight charges collect" or "third party billing."

On October 3, 1985, Jones Motor transported some of the engine parts that were ordered on behalf of the Republic of Turkey from Muskegon, Michigan, to a steamship pier located in Baltimore, Maryland, pursuant to the bill of landing and charged Prudential Lines $1,150.00 for the service. Thereafter, Jones Motor provided the identical services for Teledyne on 53 separate subsequent occasions during the period from October 3, 1985, through December 11, 1985. Jones Motor billed the same rate

---

1. The Foreign Military Sales Agreement provided that the Republic of Turkey would be responsible for arranging the transportation of the tank parts. D.I. 37 at 9. The Republic of Turkey utilized the services of its agent/freight forwarder, J.B. Wood Shipping Co., to arrange for the transportation of the tank parts from Tele-

dyne's assembly plant in Michigan to Baltimore, Maryland. *Id.* J.B. Wood contracted with Prudential Lines, Inc., a steamship company, to carry the cargo from Baltimore to Turkey. *Id.* Prudential, in turn, arranged for Jones Motor to transport the tank parts by truck from Michigan to Baltimore. *Id.*

for this service. Jones Motor has not received payment for any of its deliveries and, as such, is owed a total of $62,100.00 ($1,150 × 54), plus any accrued interest. After Prudential Lines failed to respond to demands for payment, Jones Motor demanded payment from Teledyne and the United States pursuant to the guarantee language on the bills of lading. After both Teledyne and the United States refused to render payment, the present action was filed.

## DISCUSSION

### I. Breach of Contract

With respect to its breach of contract claim against Teledyne, Jones Motor alleges that Teledyne is liable for the unpaid transportation charges under a breach of contract theory. Teledyne contends, on the other hand, that the bill of lading was a "Prepaid, Third Party Billing" situation in which Prudential, not Teledyne, was liable for the shipping charges. In support of this argument, Teledyne claims that the non-recourse provision insulates it from liability from the shipping charges. In addition, Teledyne argues that this is consistent with the purpose of the Government's shipping instructions and the inclusion of the guarantee language (*i.e.*, to protect Teledyne). D.I. 42 at 113.

Under the rule set forth in *Illinois Steel Co. v. B. & O.R. Co.*, 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259 (1944), "if the non-recourse clause is signed by the consignor [(Teledyne)] *and no provision is made for prepayment* of freight, delivery of the shipment to the consignee relieves the consignor of liability...." *Id.* at 513, 64 S.Ct. at 325 (emphasis added). In *Illinois Steel*, the Supreme Court addressed the question of whether a prepayment clause for shipping charges also included liability for additional charges not covered in the bill of lading or whether a non-recourse clause executed by the shipper shields the shipper from liability for these extra charges. In that case, the Supreme Court first noted

that "[t]he obvious purpose and effect of the non-recourse clause is to relieve the shipper from liability for freight charges, upon delivery to the consignee." *Id.* Accordingly, it held that although the shipper agreed to pay the shipping charges in advance, it did not agree to pay more "or [else] that the non-recourse clause would cease to be effective as to the unpaid charges." *Id.* The Court concluded that transportation charges in addition to those already covered by the prepaid agreement could not be charged to the shipper by virtue of the non-recourse clause. Thus, the Court found no "irreconcilable conflict between the prepayment and the non-recourse clauses." *Id.* at 514, 64 S.Ct. at 325. In other words, the prepayment clause renders the shipper liable for the original transportation charges. The non-recourse clause operates to shield the shipper from liability for the additional charges but not for the original charges it agreed to prepay.

In the present case, the non-recourse clause operates to shield Teledyne from liability only from accessorial charges not ordered on the bill of lading. D.I. 42 at 57, 64, 67. In other words, under the term "prepaid", Teledyne is still "responsible for the line haul charges", D.I. 42 at 64, 67; it is insulated from liability only from accessorial charges, if any. Since the transportation charges were not paid by Prudential, Teledyne is not shielded from liability for these charges by operation of the non-recourse clause.

Thus, the question to be resolved is whether Prudential or Teledyne is liable for the unpaid transportation charges in this case. In order to answer this question, the Court must first determine whether the bill of lading required "Third Party Billing" or whether it was "Prepaid." If the bill of lading is construed to be a "prepaid" one, then Teledyne would be liable for the unpaid transportation charges as a matter of contract law.[2]

---

**2.** Whether Teledyne, if liable, is entitled to indemnification for these charges is a question which will be addressed later in this Opinion.

"Tariffs filed with the Interstate Commerce Commission are binding contracts between the carrier and the shipper. They have the full force of law and are treated with the same import as statutes." *Coca–Cola Co. v. Atchinson, T. & S.F. Ry. Co.*, 608 F.2d 213, 219 (5th Cir.1979). The MAC Tariff 110–I which applies in this case sets forth the appropriate standards with respect to whether the bills of lading can be construed to be a "Third Party Billing." A "Third Party Billing" occurs when "charges are to be paid by a party other than the consignor or consignee ... provided that the consignor ... guarantees to pay the charges if the third party fails to do so." Government's Exhibit ("GX") 79 at 1. Moreover, "such a shipment will not be accepted if the consignor signs Section 7 of the bill of lading (the non-recourse provision)." *Id.* In the instant case, Teledyne issued 54 bills of lading with the clause:

PREPAID, MAIL FREIGHT CHARGES TO FOLLOWING ADDRESS:

Prudential Lines, Inc.

1 World Trade Center

New York, NY 10048

Attn: Bill Feyer

GX–1. Jones Motor argues that the term "prepaid" as used in the bills of lading requires the shipper, Teledyne, to pay for the unpaid transportation charges at issue in this case. Although Teledyne concedes that the word "prepaid" standing alone would require Teledyne to pay the transportation charges, it contends that the term "prepaid" is modified by the clause "mail freight charges to following address" which operates to make this a "third party

billing" situation and relieves Teledyne of responsibility for the unpaid shipping expenses. D.I. 42 at 91. Nevertheless, Teledyne did not use the words "Third Party Billing" so as to indicate that it is not liable for the shipping charges.[3]

In any event, the clause in question does not transform the bills of lading into third-party billing because it was not in conformity with the tariff. The tariff provides that third-party billing means a party other than the consignor or the consignee is to pay for the shipping bill. GX–79. In this case, Teledyne is the consignor and J.B. Wood is the consignee. However, Prudential is an agent of the consignee and, therefore, is not a third party as that term is used in the tariff. Moreover, if the consignee or its agent, Prudential, were to be liable for the transportation charges, then the bills of lading would be "collect." There is no language, express or implied, which would support an inference that the bills of lading were "collect."

Thus, the only reasonable conclusion that can be drawn from this convoluted situation is that at least Teledyne remains liable for the shipping charges. Teledyne's assertion that it cannot be held liable by virtue of the non-recourse clause is misplaced because the express terms of the tariff prohibit a third-party billing situation if the non-recourse clause is signed. Accordingly, the Court concludes that this is not a "third-party billing" situation nor is it a "collect" billing situation. Instead, liability in this case turns on the definition of "prepaid" as used in the controlling tariff.[4]

3. In addition, use of the term "prepaid" next to the mailing address does not necessarily mean that Prudential Lines is supposed to pay for the shipping charges. Instead, it could reasonably be construed to mean "mail the bill to that address." D.I. 42 at 54. In this context then, Jones Motor was supposed to send the bill to Prudential Lines who would then pass it along to Teledyne for payment. *Id.*

4. According to Item 772(a) of the MAC Tariff 110–I, "all freight charges on shipments destined to steamship piers ... *must be prepaid, except as provided in Paragraph B.*" GX–79 at 1 (emphasis added). Paragraph B provides that "[s]hipments destined to steamship piers *may be handled 'freight charges collect'* on the Bill of

Lading and Shipping Order showing in the body the name and address of the broker, agent or party from whom the charges are to be collected...." *Id.* (emphasis added). There are at least three commonly accepted definitions to the term "prepaid" as that term is used in this case: (1) the shipper has paid the carrier for the transportation charges of shipment in advance; (2) the carrier will bill the shipper subsequent to the shipment; and (3) the carrier will bill a third party subsequent to the shipment after proper guarantees were issued to insure payment of the shipment. D.I. 42 at 63. Based on the provisions of the tariff, the bills of lading are presumed to be prepaid and if the parties wish to change the allocation of risk, then it must use the term "freight charges collect."

As indicated earlier, the Court has concluded that the non-recourse clause does not insulate Teledyne from liability because it operates only to insulate Teledyne from accessorial charges. However, assuming for the sake of argument that the non-recourse clause did have the apparent effect of insulating Teledyne from liability, the Court finds that the non-recourse clause would have been improperly executed under the terms of the tariff and would therefore be invalid. Under these facts then, Teledyne is liable to Jones Motor for the unpaid shipping charges.

■ With respect to its breach of contract claim against the United States, Jones Motor argues that Ms. Fick was authorized to issue the guarantee clause since she was the Transportation Officer and an agent of the Contracting Officer, Mr. Young, who was authorized to issue the guarantee. Teledyne and the United States contend, however, that Defense Logistics Agency Regulation 2110.1 ("DLA Reg. 2110.1") and Department of Defense Regulation 5105.-38–M ("DOD Reg. 5105.38–M") prohibit the Transportation Officer from authorizing the insertion of the guarantee clause in the "prepaid" commercial bill of lading used in the present case. If Ms. Fick were authorized to insert guarantee language, then the United States must honor that clause and pay for the unpaid shipping charges. *Novak v. Rumsfeld*, 423 F.Supp. 971, 972 (N.D.Cal.1976); *Kizas v. Webster*, 492 F.Supp. 1135, 1146 (D.D.C.1980), *aff'd in part and rev'd in part*, 707 F.2d 524 (D.C. Cir.1983). If Ms. Fick were not authorized to insert the guarantee language, then the United States would not be liable under the terms of the guarantee clause. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Heckler v. Community Health Services*, 467 U.S. 51, 63 n. 17, 104 S.Ct. 2218, 2225 n. 17, 81 L.Ed.2d 42 (1984).

DLA Reg. 2110.1 provides that "the normal method for movement of Foreign Military Sales material to a freight forwarder designated by purchaser is by freight collect shipments...." GX–172 at 4. However, the regulation also provides that: "Due to carrier's tariff restrictions, refusal to accept collect freight shipments, or other reasons, the following statement will be annotated *on the collect commercial bill of lading:* 'Charges for this shipment are guaranteed by the Transportation Officer.' " GX–172 at 6 (emphasis added). The United States argues that DLA Reg. 2110.1 nowhere permits the use of guarantee language on prepaid commercial bills of lading. In any event, the United States conceded in post-trial briefing that DLA Reg. 2110.1 does not apply to the present case. D.I. 49 at 2.[5]

On the other hand, DOD Reg. 5105.38–M provides that:

> When shipment cannot be effected by [a] collect [Commercial Bill of Lading], due to tariff restrictions, refusals of carriers to accept collect freight shipments, or other reasons, the following are applicable: a. Only when the LOA ["Letter of Agreement"] so authorizes may the shipping transportation office guarantee payment of charges on collect [Commercial Bills of Lading].

GX–171 at 3. The language of DOD 5105.-38–M plainly indicates that the Government is authorized to guarantee the payment of transportation costs of commercial bills of lading which are not "collect" *only* if the LOA so provides. Because the LOA between the United States and the Republic of Turkey does not authorize either the contracting officer or the transportation officer to guarantee shipping charges, DOD 5105.38–M prohibited Ms. Fick from inserting the guarantee language in the bills of lading. Thus, the United States is not liable to either Jones Motor or Teledyne for

GX–79. Since Teledyne did not use this language, it is reasonable to conclude that the bills of lading at issue in this case are to be "prepaid."

**5.** DLA Reg. 2110.1 applies to foreign military sales "shipments from contractor's facilities only when the procurement is made by the Defense Supply Centers." GX–172 at 4. Since the shipments at issue in this case were not made pursuant to a Defense Supply Center procurement, DLA Reg. 2110.1 does not apply to the procurements at issue.

the unpaid shipping charges under a breach of contract theory based on the United States' refusal to honor the guarantee language.

## II. Promissory Estoppel

 Plaintiff and Teledyne both claim that even if Ms. Fick was not authorized to issue the guarantee language, the United States is still liable for the unpaid shipping charges under the theory of promissory estoppel. *See Broad Ave. Laundry and Tailoring v. United States*, 681 F.2d 746 (Ct.Cl.1982); *Kizas*, 492 F.Supp. at 1145; *Robbins v. Reagan*, 780 F.2d 37 (D.C.Cir. 1985); *Wroten v. Mobil Oil Corp.*, Del. Supr., 315 A.2d 728, 729 (1973). In *Heckler*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 the Supreme Court noted that while most Circuit Courts permit recovery against the Government under the doctrine of estoppel, it has never been addressed by the Supreme Court. Noting that the historic rule disfavors the imposition of an estoppel defense against the Government, *see, e.g., Federal Crop Ins. Corp.*, 332 U.S. at 384–85, 68 S.Ct. at 3 ("anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of authority may be explicitly defined by Congress...." *Id.* at 384, 68 S.Ct. at 3. Thus, " 'Men must turn square corners when they deal with the Government.' " *Id.* at 385, 68 S.Ct. at 3). The Court in *Heckler* stated that "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law." *Heckler*, 467 U.S. at 63 & n. 17, 104 S.Ct. at 2225 & n. 17. The Court was "hesitant ... to say there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Id.* at 60–61, 104 S.Ct. at 2224.

Nevertheless, every Circuit Court of Appeals has considered the issue of Government estoppel at some point. *See U.S. v.*

*Asmar*, 827 F.2d 907, 911 n. 4 (3rd Cir. 1987) (discussing the estoppel position in the various circuits). The burden of proof is on the party claiming estoppel. *Id.* at 912 (citing *Lyng v. Payne*, 476 U.S. 926, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986). As the Court suggested in *Heckler*, a party cannot prevail on an estoppel claim without at least demonstrating the traditional elements of estoppel. *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224; *Asmar*, 827 F.2d at 912. "Therefore, to succeed on a traditional estoppel defense the litigant must prove (1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *Asmar*, 827 F.2d at 912. Moreover, it is now "well settled that the Government may not be estopped on the same terms as any other litigant" because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224. The Third Circuit recognizing the " 'judicial reluctance ... based upon considerations of sovereign immunity, separation of powers and public policy, such as the fear of binding the government by the improper acts of its agents due to fraud and collusion or of the severe depletion of the public treasury,' *Lovell Manufacturing v. Export–Import Bank of the United States*, 777 F.2d 894 (3d Cir.1985), has identified a fourth element that must be proven when a party alleges estoppel against the government.... [I]n this circuit, a litigant must prove 'affirmative misconduct' to succeed on an estoppel claim against the government." *Asmar*, 827 F.2d at 912.

The Plaintiff has succeeded in demonstrating the existence of the traditional elements of estoppel in this particular case. First, if Ms. Fick did not have the authority to issue the guarantee of the transportation charges, then she made a material misrepresentation to Teledyne to issue shipping instructions with the guarantee clause. Second, it was reasonable for Teledyne to rely upon the guarantee clause because Ms. Fick was the Transportation Officer of DCAMSA and the agent of the

Contracting Officer, Mr. Young, and the Prime Contract stated that Teledyne was to issue shipping instructions as stated by the DCASMA. Third, Jones Motor also relied upon the guarantee clause to its detriment because it was having difficulties with Prudential Lines in the past and would not have delivered the tank engines to the Baltimore steamship pier "but for" the Government's guarantee of payment. However, Plaintiff has failed to introduce evidence that Ms. Fick acted with "affirmative misconduct" by either intentionally or recklessly inserting the guarantee language into the bills of lading. Instead, Plaintiff and Teledyne argue that if Ms. Fick's action was unauthorized it was a "mistake of law" and the Government is still liable under the holding of *Broad Ave.* Even if Plaintiff's argument were correct, a mistake of law is analogous to "mere negligence", *cf. Commercial Union Ins. v. Ramada Hotel Operating Co.*, 852 F.2d 298, 301 (7th Cir.1988), and does not rise to the level of "affirmative misconduct" necessary to hold the Government liable for the unpaid shipping charges at issue in this case. *See Simon v. Califano*, 593 F.2d 121, 123 (9th Cir.1979) (neglect of duty not affirmative misconduct); *United States v. Ven–Fuel, Inc.*, 758 F.2d 741, 761 (1st Cir. 1985) (carelessness and sloppy actions of the Government are not affirmative misconduct). Thus, the Court concludes that the Plaintiff is not entitled to recover the unpaid shipping charges from the Government under a theory of promissory estoppel.

III. Quantum Meruit

Finally, both Jones Motor and Teledyne contend that the United States is liable for the unpaid shipping charges under the theory of *quantum meruit*. This Court agrees. As the Federal Circuit has recognized, "in many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the Government in the form of goods and services, which it accepted, a contractor may recover at least on a *quan-tum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government...." *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986); *see also Prestex Inc. v. United States*, 320 F.2d 367, 373, 162 Ct.Cl. 620 (Ct.Cl.1963) and cases cited therein. "Since the amount of recovery by the contractor under this theory is limited to the value of the benefits *to the government*, it follows that if the government receives no benefit from the contractor's performance, the contractor receives no compensation." *Amdahl*, 786 F.2d at 393; *see also Prestex*, 320 F.2d at 373; *Schoenbrod v. United States*, 410 F.2d 400, 404, 187 Ct.Cl. 627 (Ct.Cl.1969); *Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1376–77, 220 Ct.Cl. 210 (1979).

In the present case, Jones Motor and Teledyne contend that the Government received a benefit by virtue of the guarantee language in the bill of lading. For example, the Government was aware that, absent the guarantee, there would be some difficulty complying with the contract with the Republic of Turkey. Under the Foreign Military Sales agreement, the Government was obligated to have the tank parts delivered from Michigan to a port of entry (*i.e.*, Baltimore) even though it was at Turkey's expense. Nevertheless, the Government had a sufficient contractual interest in securing the delivery of the military equipment to a United States port so that Turkey could take possession of the tank parts. Because of this contractual relationship, the Government had an interest in ensuring delivery to the port of destination. D.I. 43 at 181. Although misguided, the Government inserted the guarantee clause so as to induce Jones Motor to accept the contract to transport the tank parts to Baltimore so that the Government could ensure delivery of the tank parts to the United States port of entry. Thus, the value of the benefit conferred to the Government in this case is the value of the service provided which, as mandated by the tariff, is $1,150.00 per shipment or a total of $62,100.00 for the 54 shipments.

The Court concludes that the Government received the benefit of the service provided by Jones Motor in transporting the tank parts from Michigan to Baltimore and Jones Motor is entitled to receive fair compensation for that service as guaranteed by the Government in the bills of lading. The Court also notes that it would be unfair and inequitable for the Government to induce Jones Motor to enter into the contract to deliver these goods and then turn its back when payment is due. For the same reasons, the Court also finds that the Government must indemnify Teledyne for any of the $62,100.00 that it may have paid for the transportation costs.